EASTON FARMERS ELEVATOR COMPANY v.
CHROMALLOY AMERICAN CORPORATION AND ANOTHER.

246 N. W. 2d 705.

October 22, 1976—No. 45880.

*William R. Busch,* for appellant Chromalloy.

*Erickson, Zierke, Kuderer, Utermark & McKenna* and *D. Gerald Wilhem,* for appellant McFarland.

*Gordon J. Berg* and *John F. Hacking,* for respondent.

Heard before Rogosheske, Kelly, and Scott, JJ., and considered and decided by the court en banc.

PER CURIAM.

This is an appeal by defendants, a manufacturer and its sales agent, from a judgment in favor of plaintiff grain cooperative and from the denial of their post-trial motions for a new trial. The jury by special verdict found that in selling a commercial corn drier defendants made false representations and breached express and implied warranties, causing plaintiff damage in the amount of $100,000.[1] The principal issue is whether the evidence sustains the jury's finding of liability and award of $100,000 damages. Defendants contend there was insufficient evidence to warrant submission of the fraud and breach of warranty claims to the jury or to support the jury's award of damages, and that the trial court erred in refusing to allow a postverdict interrogation of the jurors for possible misconduct. Plaintiff seeks review of the trial court's denial of its motion for a new trial limited to the issue of punitive damages, which plaintiff argues should have been submitted to the jury. In support of this motion the plaintiff relies upon the jury's special verdict findings of defendants' fraudulent misrepresentations in selling the drier and the plaintiff's reliance thereon. We affirm the trial court's disposition of the case except that, for reasons later set forth,

---

[1] Prior to trial, the court ruled that by its conduct plaintiff had "accepted" the corn drier and was liable for the unpaid contract price of the drier ($37,365), and thus that Chromalloy was entitled to recover that amount against plaintiff on its counterclaim as a matter of law. No appeal is taken by plaintiff from this ruling.

we are persuaded that a new trial limited to the issue of plaintiff's consequential damages is necessary unless plaintiff consents to a remittitur.

Plaintiff Easton is a cooperative grain elevator in Easton, Minnesota, which purchases grain from farmers within a farming radius of 5 or 6 miles. The farmland around Easton is used to grow corn and soybeans almost exclusively. After corn is harvested and brought to the elevator, it must be dried mechanically before it can be sold or stored by plaintiff. A "Hart-Carter" corn drier, previously used successfully by plaintiff between 1970 and 1973, was completely destroyed by windstorm on August 21, 1973.

The following day, defendant McFarland, a local sales agent for defendant Chromalloy American Corporation, called upon plaintiff's elevator manager, William Ricke, and presented him with a brochure describing Chromalloy's line of corn driers. Ricke testified that McFarland represented that Chromalloy had a Model SH 100B "Shunk" three-tower corn drier available for $57,086 with a new modulating gas valve that was a "terrific gas saver" and plaintiff "would be surprised at the amount of gas saving."

On August 27, 1973, McFarland met with Ricke and the seven directors of the grain cooperative, distributed more brochures, and discussed the Shunk drier described. McFarland also told Ricke and the directors that Don Reed, a Chromalloy factory engineer, would be at Easton the following evening and that Reed would answer all questions which Ricke and the directors might have regarding the drier. At the August 27 meeting, after Ricke explained the existing gas supply, McFarland further represented that if Easton had enough propane gas to properly operate the old corn drier, it had sufficient capacity to operate the proposed Shunk drier. The composite testimony of two directors was that McFarland also represented at this meeting that the Shunk drier would dry over 1,500 bushels of corn per hour from 27-percent moisture to 12-percent or 13-percent moisture, and in doing so would dry 18 bushels of corn for every gallon of propane burned. The reason for this low fuel consumption rate was the Shunk drier's new modulating gas valve.

The next evening during a half-hour's discussion prior to the meeting with six directors (one being absent), Reed and McFarland, accompanied by Ricke, examined and inspected the drier site, the spouting at the elevator, the grain leg, the gas supply pipes, and the concrete pad upon which the old drier had been situated prior to its destruction. At the meeting, Reed, after assurances of his engineering status with Chromalloy and the availability of the drier for the fall corn-drying season, passed out more brochures and engaged in a lengthy discussion

and computation concerning the performance capacity of the Shunk drier.

Ricke and the five directors testified in substance that at the August 28, 1973, meeting Reed repeated many times the following representations: (1) The Shunk drier would dry corn from 27-percent moisture to 13-percent moisture at a rate of 1,500 bushels per hour or better; (2) the drier would consume only 1 gallon of propane for every 18 bushels of corn so dried; and (3) if Easton's propane gas supply system was adequate for the old drier, it was easily adequate for the Shunk drier. According to their testimony, these representations were believed to be true by several of the directors and were relied upon by these directors in directing Ricke to purchase the Shunk drier.

The following day, after the manufacturer's verification of timely delivery was conveyed by Reed, Ricke signed the contract to purchase the Shunk drier. The purchase price was $47,365, and Ricke paid on behalf of Easton $10,000 to Chromalloy as a downpayment.

Ricke also contracted in writing at that time to pay $9,721 for installation by McFarland, the latter to furnish and install all augers and spouting and do all things necessary to put the drier into operating condition. Although Easton has paid only $5,800 of this contract obligation, McFarland has neither demanded nor counterclaimed for the balance.

The drier was delivered and installed by McFarland and was ready for operation on October 9. A relatively small amount of wet corn was delivered for drying between October 11 and October 15, and during that period the drier was operated for approximately 12 to 20 hours. According to Ricke, during this period the drier dried less than 1,000 bushels per hour and removed 14 to 16 percentage points of moisture.

On October 22, after the soybean harvest, Easton began drying substantial amounts of corn. By October 24, the screens of the drier had become plugged with foreign matter and, according to Ricke, its drying capacity had dropped to between 400 and 500 bushels per hour. Dissatisfied with its performance, Ricke emptied the drier to make sure nothing was impeding the flow of corn, refilled it, and found that it was still drying 400 bushels or less of corn per hour. Due to the poor operation of the drier, Ricke called Reed on two or three occasions and informed him that the drier was not working as expected; that the screens were plugged; that no heated air could move through the corn; that Easton was not "getting any production"; and that production at a rate of merely 400 bushels per hour was of no use to Easton.

On October 27, Reed and another representative of Chromalloy, Gene Mahley, came to Easton and examined the drier. After hearing Ricke's complaints, including the fact that the drier was consuming too much

gas for the amount of corn dried, Reed and Mahley discussed various ways of modifying the drier. They decided to reduce it from a three-tower drier to a two-tower drier by fabricating and welding a large steel bulkhead into it, thereby completely eliminating the entire south tower from operation. Ricke told Reed that he was willing to go along with any of Reed's suggestions to improve the production of the drier because its present performance was unsatisfactory.

The modification proposed was completed the next day with the help of Easton's personnel. The southernmost of the three towers of the drier was rendered completely inoperative. Reed and Mahley did not change the fans or the size of the burners in this modification, so burners and fans designed to heat a larger three-tower drier now heated only two towers. The evening of that day, the modified drier was filled and put into operation. Ricke operated the drier the entire evening of October 28, through the morning of October 29. He testified that the modification had accomplished nothing and the drier continued to dry only 400 bushels per hour.

On October 29, McFarland came to Easton and observed that the screens of the drier were completely plugged and that the heated air could not flow through the screens and thus could not reach the corn to be dried. According to Ricke, McFarland then telephoned Robert Hubble, president of the Chromalloy division which manufactures the Shunk drier, and told Hubble that the screens were plugged with foreign material, that the drier was not drying any corn, and that Easton was using far too much propane in its drying operation. McFarland asked Hubble if any replacement screens were available of the type used by Chromalloy in the past in its manufacture of grain driers. While McFarland was talking to Hubble, Ricke prepared a note containing various production statistics and handed it to McFarland to aid him in his conversation with Hubble. During the telephone conversation, McFarland wrote the following words on the note, "Once a dog always a dog."

Ricke testified that he called Hubble the following two days regarding the availability of new screens. Hubble informed him they would be shipped that day but that no Chromalloy personnel were available to help in the changing of the screens. Ricke therefore located and procured laborers and also scaffolding and other material necessary for the change. The new screens arrived at Easton 1 or 2 days later. Ten men each labored 24 hours in changing the screens on the two remaining operative towers. Easton paid all expenses arising out of this change. The holes in the new screens were twice the .045 inches in

diameter of the original screens and increased by three or four times the original air flow.

On November 1, after the screens had been changed, Easton resumed its corn-drying operation. Thereafter, Easton took many samples of corn from the drier and found that some areas of the drier were not drying any corn, some areas of the drier were not cooling the corn, and other areas were actually burning the corn. After changing the screens, the drier "dried" 400 to 500 bushels per hour and burned 1 gallon or more of propane for every 4 bushels of corn "dried." Ricke could not estimate the total amount of corn which had been burned by the drier since much of the burned corn had been returned to farmers. Nevertheless, at the end of the drying season, Easton had 80,000 bushels of burned corn in its storage facilities. This was blended with good corn and shipped to buyers in terminal markets after the 1973 drying season.

When Easton resumed the drying operation after the screens had been changed, some difficulty was experienced in heating the drier to its operational temperature. Attempting to remedy this problem, Easton connected an additional gasline from the top of the 18,000-gallon storage tank to the portion of the existing fuel line which contained vapor, thereby bypassing the vaporizers. The drier then immediately came to operational temperature, and Easton again commenced its drying operation. Easton's vaporizers never shut down because they were called upon to deliver more vapor than their capacity or because of lack of propane. In order to ensure that Easton had sufficient vapor pressure at the drier's site, Easton installed a pressure gauge on the vapor line. The pressure reading on this gauge never fell to zero, a condition which would have indicated that the drier required more vapor than was available for its use.

Except for the interruptions occasioned by the sealing off of one tower, the replacement of the screens, and emptying and filling the drier, Easton utilized the drier continuously from October 22 until November 10. At this time, plaintiff's corn-handling equipment was rendered inoperative due to a failure unrelated to the drier. This equipment was not repaired until November 19 and the drier remained idle during this 9-day period.

Based on Easton's business records, Ricke testified that Easton received 323,718 bushels of wet corn for drying in 1973 and dried 293,718 bushels with the Shunk drier. The remaining wet corn was mixed with dry corn prior to shipment. Based on the number of hours of operation, the drier dried substantially less than the represented output of 500 or more bushels per hour.

The amount of propane used by the drier during the 1973 drying season was calculated by Ricke according to the number of gallons delivered by Easton's supplier less the recorded withdrawals by the supplier from its 18,000-gallon storage tank. The difference in these amounts, 80,595 gallons, was claimed as the amount of gas used by the drier. Since 293,718 bushels of corn were dried over the 1973 season, Ricke calculated and testified that the drier dried 3.64 bushels per gallon, substantially less than the 18 bushels per gallon represented by Reed and McFarland.

Defendants argue at length that there is insufficient evidence to support the jury's special verdict finding of each of the essential elements of fraud and breach of express and implied warranties. Much of defendants' argument relates various alleged inconsistencies in the testimony of plaintiff's witnesses and recounts the testimony of several defense witnesses adverse to plaintiff's case. Although our careful review of the record persuades us that the evidence of what happened in the negotiation and dealings between these parties is strongly disputed at several crucial points by the many witnesses who testified, in our opinion there was ample evidence from which the jury could find each of the essential elements of fraud, breach of express warranty, and breach of implied warranty.

Several of the directors of Easton as well as Ricke testified that, at the August 28 meeting, the sales representatives of defendant Chromalloy (Reed and McFarland) orally represented to them that the Shunk corn drier would dry over 1,500 bushels of corn an hour while removing 14 points of moisture from the corn (27 percent to 13 percent). They also testified that it was represented that the drier would consume only 1 gallon of propane in drying 18 bushels of corn. Reed and McFarland offered these figures that night after doing extensive mathematical computations based on the machine's specifications. In fact, the drier at Easton dried substantially less than 1,500 bushels of corn an hour and apparently used 1 gallon of gas for approximately 4 bushels of corn dried. Viewing the evidence most favorably to the verdict on appeal, as we must, it is clear that if the jury credited the testimony of plaintiff's witnesses they were justified in finding that defendant's sales agents had misrepresented their product and given oral express warranties which were later breached.

Defendants contend that the Easton directors did not rely on these misrepresentations in purchasing the corn drier, or if they did, that their reliance was unreasonable and unjustified. In particular, defendants rely on the deposition testimony of several of Easton's directors to the effect that they were skeptical that any corn drier could dry over

1,500 bushels per hour at 14 points removal. They also argue that the directors asked Ricke to verify these figures with the factory before buying the drier. While this testimony does support defendants' jury argument, there was other testimony that the Easton directors were convinced by the mathematical computations of Reed and McFarland of the drier's represented performance capacity. Their aggressive efforts to persuade plaintiff's directors of the excellence of their new machine, the impressive credentials of Reed as a factory engineer with "all the answers," and their representation of the drier's new "modulating gas valve" as a significant innovation for improving performance and fuel efficiency over prior models afforded the jury a sufficient evidentiary basis to find actual and justifiable reliance by plaintiff's directors on defendants' misrepresentations.

Under Minn. St. 336.2—313, an express warranty arises when a seller makes an affirmation of fact about the product which becomes part of the "basis of the bargain" between the parties. Here, Reed's alleged statements about the bushels-per-hour and bushels-per-gallon performance of this corn drier, if credited by the jury, clearly constitute express warranties which were central to the negotiated bargain between the parties.

Under § 336.2—314, in order for a product to be merchantable, it must "pass without objection in the trade under the contract description" and must be "fit for the ordinary purposes for which such goods are used." Notwithstanding adverse testimony by defendants' expert witness, in our view the jury was justified in finding this corn drier unmerchantable because (1) the original screens used on the Shunk corn drier were ungalvanized and became partially plugged with rust and other foreign matter when used despite the fact a witness testified all other corn driers used galvanized screens; (2) the holes in the original screens were only .045 inches and several witnesses testified they had never seen a corn drier with holes so small; and (3) after the replacement screens with the larger holes were installed on the drier, a substantial part of the corn which was dried was parched or burnt. If the jury credited plaintiff's witnesses on these points, as it would have been reasonable for them to do, there was abundant evidence from which to conclude that the Shunk corn drier at Easton was sold in breach of the implied warranty of merchantability.

In his closing argument to the jury, plaintiff's counsel was permitted to argue for the following items of damage:

(1) $47,365.00 to compensate plaintiff for the contract price of the corn drier now alleged to be worthless;

(2)  27,004.46  to compensate plaintiff for the lost profits on the corn not dried due to the poor performance of the corn drier;

(3)  8,101.23  to compensate plaintiff for the lost profits on the corn not stored at Easton's elevators because it was dried elsewhere;

(4)  3,857.90  to compensate plaintiff for lost sales commissions on corn not sold by Easton because it was dried and sold elsewhere;

(5)  1,927.82.  incidental expenses incurred by plaintiff in installing and repairing the Shunk drier during the 1973 season;

(6)  5,800.00  expenses incurred by plaintiff in initially installing the corn drier;

(7)  11,570.04  the additional propane gas expense incurred by plaintiff due to the poor fuel efficiency of the corn drier; and

(8)  40,000.00  to compensate plaintiff for the 80,000 bushels of corn parched by the Shunk corn drier.

$145,626.45  TOTAL

Defendant alleges that plaintiff failed to offer sufficient proof of each of these items of damage and that the resulting jury verdict of $100,000 was thus improperly based on speculation. This allegation necessitates a review of the evidence underlying each of these damage claims.

(1). Plaintiff's claim for the full contract price of the corn drier was based on the fact that it was required, pursuant to Chromalloy's counterclaim, to pay the total contract price of the drier even though Ricke's testimony was that, both at the end of the 1973 drying season and at the time of trial, the Shunk drier was worthless and had to be entirely replaced. Defendant disputed that the unit was worthless and offered the testimony of Hubble, president of Chromalloy, who stated that, at current prices, for $10,000 the unit could be shipped back to the factory and completely repaired and refurbished, and could then be sold for $50,000. Defendants further contend that Ricke should not have been allowed to express his opinion on the value of the drier because he was not qualified by experience or training to do so. This argument is without merit, going to the weight of the testimony and not to its admissibility. Ricke had experience in buying corn driers in the past. In addition, he has had actual experience in operating the Easton Shunk drier, something Hubble lacked. The poor performance of the drier in 1973 and the fact that Chromalloy was unable to successfully repair it after

attempting twice to do so casts doubt on the credibility of Hubble's testimony. In any event, the jury was competent to assess from the conflicting testimony the commercial value of the drier.

(2). Plaintiff sought $27,004.46 for lost profits for grain not dried on the theory that, since it usually made a net profit of 14 cents per bushel and since the Shunk drier could have dried 50 percent more corn in 1973 than in 1972 (or 192,889 bushels more than actually dried in 1973) if the drier had performed as represented, it was entitled to .14 x 192,889 or $27,004.46. Plaintiff's argument that it could have dried 50 percent more corn in 1973 than in 1972 was based on the fact the drier was represented to be 50 percent faster (1,500 bushels per hour) than the old drier it replaced (less than 1,000 bushels per hour) and on the fact that a bumper corn crop was produced in 1973 on the farms immediately surrounding the Easton elevator. In our view, plaintiff's claims were reasonable and constituted fair argument. While plaintiff did not show what quantity of corn was dried at competing elevators due to the poor performance of the corn drier at Easton and the resulting long delays in delivering corn to Easton during the busy season, its projection of its own probable business in 1973 if the drier had worked as represented gave the jury sufficient information to assess its lost profits without resort to mere speculation.

While the fact plaintiff's corn-drying operation was discontinued for 9 days in November 1973 due to a breakdown in the corn-handling equipment tends to undermine the reliability of plaintiff's projected loss figures in 1973, in our view this fact does not make plaintiff's testimony as to projected business and damages in 1973 worthless so as to render the jury damage award speculative.

(3) through (7). These damage items were supported by competent testimony at trial, including evidence of past storage profits, past resale commissions, past propane gas consumption records, and expense records.

(8). The most troubling aspect of this case concerns the trial judge's decision allowing plaintiff to argue for $40,000 damages due to the 80,000 bushels of parched corn allegedly produced by the Shunk drier. Ricke testified that 80,000 bushels of corn were parched in some degree by defendant's drier, but what is not clear is whether plaintiff was in any way injured by this fact. Ricke testified that this burned corn was blended off very slowly in Easton's shipments to terminal grain markets. He also testified that no separate records were kept of this corn and that presumably after blending it was sold without penalty as No. 2 yellow corn. The difference in value between No. 1 yellow corn and No. 2, if any, was not revealed.

Damages due to the parched corn had not been pleaded or disclosed by plaintiff in pretrial discovery. At one point during the trial, plaintiff's counsel apparently assured defense counsel he would not press the point. When defendants objected to the presentation of this claim to the jury, the judge appeared to be uncertain whether there was sufficient evidence to support this claim but allowed the argument and instructed the jury as follows:

"* * * Now, there is just one item on that blackboard that Mr. Berg was using I want to comment on. I can tell you, although you can hear, that defendants objected very strenuously to that last item there, $40,000.00 for burned corn. Their position is that there was no evidence offered by any witness that there was damage due to that burned corn. Now, I don't remember, the plaintiff thinks there was, I don't remember frankly whether there was or not, but I'm leaving it in there and I'll leave it to you to decide whether there was any evidence along that line."

Because plaintiff offered no basis from which the jury could rationally infer the extent of plaintiff's injury due to the parched corn, and because in our view the judge erroneously allowed the jury to speculate on this item of damages, there is substance to defendants' claim of error. Whether or not the jury in fact actually awarded damages for the parched corn cannot be determined since it simply returned a lump-sum verdict of $100,000. Mindful of the nature of the proof with respect to other items of claimed damages for loss of profits and sales, and having tried to find a rational basis in this record for determining that the jury excluded from its award damages for parched corn, we feel compelled under these circumstances and in the interests of justice to conclude that a new trial is necessary unless plaintiff consents to a remittitur in an amount which assesses the effect of the erroneous submission of damages for parched corn. Cf. Jackson v. Buesgens, 290 Minn. 78, 186 N. W. 2d 184 (1971). We believe the amount of the remittitur can best be determined after hearing by the trial court. In our collective judgment, it should not exceed $20,000. Cf. Auger v. Rofshus, 267 Minn. 87, 94, 125 N. W. 2d 159, 164 (1963) (Rogosheske, J., dissenting).

Shortly after the conclusion of the trial, Chromalloy requested a hearing in accordance with the procedure set down in Schwartz v. Minneapolis Suburban Bus Co. 258 Minn. 325, 104 N. W. 2d 301 (1960), to determine the seriousness and impartiality of the jury. This motion was supported by an affidavit of defense counsel averring (1) that McFarland told him a friendly relationship existed between one of the jurors and one of the directors of Easton; and (2) that the jury had enclosed a car-

toon[2] with the verdict form they handed to the bailiff at the conclusion of the trial. The question of whether a Schwartz hearing is necessary is addressed to the discretion of the trial court, Olberg v. Minneapolis Gas Co. 291 Minn. 334, 191 N. W. 2d 418 (1971), and we are persuaded defendants failed to aver sufficient facts suggesting jury misconduct so that the failure to grant a Schwartz hearing constituted an abuse of discretion.

Plaintiff in its notice of review seeks a new trial solely on the issue of exemplary damages. At trial, plaintiff requested, but was denied, an instruction on exemplary damages if the jury should find that defendants willfully and wantonly misrepresented the drier. The trial judge presumably refused this instruction and denied plaintiff's post-trial motion because plaintiff had failed to offer proof of actual malice on the part of defendant Chromalloy or its agents. We agree with the trial judge's implicit conclusion that on this record there is no evidence which would support a finding of exemplary damages and accordingly we find plaintiff's claim to be without merit. See, Benson Co-op. Creamery Assn. v. First District Assn. 276 Minn. 520, 151 N. W. 2d 422, 152 N. W. 2d 182 (1967).

Affirmed in part, reversed in part, and remanded for a new trial on the issue of plaintiff's damages unless plaintiff consents to a remittitur in an amount, not to exceed $20,000, to be determined by the trial court.

---

[2] The trial court described the cartoon as follows: "* * * It shows a courtroom scene with the Judge sitting at the bench and the court reporter at his machine, and his table and the jury in the jury box, and the foreman standing and saying 'yes, we have, Your Honor, and we talked it over and we have decided this is really none of our business.'"