WILLMAR COOKIE
COMPANY, Respondent,

v.

PIPPIN PECAN COMPANY, a Georgia
Corporation, Appellant.

No. C7–84–19.

Court of Appeals of Minnesota.

Oct. 30, 1984.

L. Wayne Larson, Hulstrand, Anderson, Larson & Boylan, Willmar, for respondent.

Thomas G. Johnson, Schmidt, Thompson, Thompson & Johnson, P.A., Willmar, for appellant.

Heard, considered and decided by LANSING, P.J., and WOZNIAK and FORSBERG, JJ.

## OPINION

LANSING, Judge.

Pippin Pecan Company appeals from the denial of post-trial motions and from a judgment based on special verdict findings that the company sold unmerchantable pecans, unfit for their intended purpose, and that the purchaser gave timely notice of breach and revocation of acceptance. The company also contends it is entitled to a new trial on the basis of newly discovered evidence. We affirm.

## FACTS

This appeal involves 642 cases of shelled, standard grade pecan halves purchased by Willmar Cookie Company of Willmar, Minnesota, from Pippin Pecan Company of Albany, Georgia, in September 1981. The pecans were to be rebagged for the retail market. In July of 1981 Willmar Cookie had purchased and processed a similar order. Pippin Pecan shipped the pecans in an unrefrigerated truck on September 28, 1981, and they arrived on October 1. The invoice and notices on the cases stated that the pecans were perishable and had to be refrigerated at 32 to 36 degrees Fahrenheit. The invoice also stated that the buyer should inspect the shipment and submit any claims within five days of delivery. The plant manager spot-checked the delivery on arrival by opening three or four cases.

On October 2 Willmar Cookie began rebagging the pecans. Within a few days employees found mold in some of the pecan cases, and the plant manager told them to package only the good pecans. Willmar Cookie president Andrew Goedert called Tamara Williams, a telephone solicitor (now sales manager) for Pippin Pecan, on October 5, 1981, and told her about the mold. She testified that she instructed Goedert to set aside questionable pecans and indicated that Pippin Pecan would take care of the problem. Goedert and Williams had a number of additional conversations between October 5 and December 9. Goedert was not able to testify about those conversations because he died before trial; Williams denied discussing any problems concerning the pecans during those conversations.

Willmar Cookie continued processing the pecans until about October 15, when the company decided it was no longer worthwhile to sort them. At this point, pecans totaling more than ten cases had been discarded, 147 cases remained unprocessed in the warehouse, and more than 400 cases had been processed. Some of the pecans had been sent out for retail sale, although over half were held at the plant because of the quality problems.

Willmar Cookie began receiving reports from customers that the pecans tasted stale and rancid and were not wholesome. Many rebagged pecans were picked up by Willmar Cookie over a four-state area and credit memos were issued for them. On December 9 Goedert again called Williams to complain about the pecans. Pippin Pecan responded that "70 days is an unreasonable amount of time to make a complaint" and asked for more detail. Willmar Cookie contacted Pippin Pecan several more times with no success before sending a formal revocation of acceptance letter on February 5, 1982, and commencing litigation in March 1982.

The jury rendered a special verdict, finding that (1) Pippin Pecan breached the implied warranty of fitness for a particular purpose; (2) it breached the implied warranty of merchantability; (3) Willmar Cookie gave notice of the breach of warranty within a reasonable period after it discovered or should have discovered the breach; (4) Willmar Cookie revoked acceptance of the pecans within a reasonable period; (5) the breach of warranty was a direct cause of Willmar Cookie's damages; and (6) Willmar Cookie would be adequately and fairly compensated by $49,132.08, including reimbursement and processing costs for pecans not sold, storage costs, and interest.

Pippin Pecan moved for judgment notwithstanding the verdict, which the trial court denied, saying there was "substantial testimony from Willmar personnel that the pecans were moldy, rancid, and discolored.

In such a condition, the pecans, even though of standard grade, were not fit for human consumption." The trial court also found substantial evidence to support timely notice to Pippin Pecan and found that Willmar Cookie "attempted to minimize the damage to Pippin by attempting to process that portion of the shipment which Willmar determined to be of merchantable quality."

## ISSUES

1. Does the evidence support the jury's verdict that Pippin Pecan breached the implied warranty of merchantability?

2. Does the evidence support the jury's verdict that Pippin Pecan breached the implied warranty of fitness for a particular purpose?

3. Was Willmar Cookie's notice of breach and revocation timely?

4. Did Willmar Cookie breach any duty of care to the rejected pecans?

5. Is Pippin Pecan entitled to a new trial on the basis of newly discovered evidence?

## ANALYSIS

### I

■ On review, this court may set aside the answer to a special verdict question "only if perverse and palpably contrary to the evidence, or where the evidence is so clear as to leave no room for differences among reasonable persons." *Jacobs v. Rosemount Dodge-Winnebago South*, 310 N.W.2d 71, 76 (Minn.1981) (citing *Bergemann v. Mutual Service Insurance Co.*, 270 N.W.2d 107 (Minn.1978)). The jury determined that Pippin Pecan had breached the implied warranty of merchantability contained in Minn.Stat. § 336.2–314, which provides:

Goods to be merchantable must be *at least* such as

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

Minn.Stat. § 336.2–314(2) (1982) (emphasis added).

■ Willmar Cookie ordered "standard" grade pecans. Pippin Pecan contends that Willmar Cookie selected the wrong grade for retail sale, since standard pecans are generally used for cookies and candies. Substantial evidence was presented, however, that some pecans were moldy and discolored and that customers returned pecans with comments such as "awful" and "rancid." Pecans, even of a grade used for cookies and candy, must be fit for human consumption to be merchantable. There was clearly sufficient evidence here to support the jury's determination that the pecans were not fit for human consumption and therefore were not merchantable.

■ Pippin Pecan also contends that Willmar Cookie failed to prove damages, which is necessary to prevail on a breach of the implied warranty of merchantability. *See* J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 9–6, at 343 (2d ed. 1980). Specifically, Pippin Pecan claims that Willmar Cookie offered no evidence of the current market value of the pecans. Pippin Pecan offered testimony that the pecans were worth $2.40 per pound when delivered and $.28 per pound in September 1983. Willmar Cookie, however, offered evidence that the pecans were worth nothing because it was not economical to sift the good ones from the bad. The jury is competent to assess the weight of the evidence presented and make its determination. *Cf. Easton Farmers Elevator Co. v. Chromalloy*

*American Corp.,* 310 Minn. 568, 576–77, 246 N.W.2d 705, 711 (1976).

■ Pippin Pecan also disputes causation, another essential element of a breach of the implied warranty of merchantability. *See* J. White & R. Summers, § 9–6, at 343. Pippin Pecan contends it did not cause the damage to the pecans, but that Willmar Cookie did not properly refrigerate them. Willmar Cookie's testimony indicating the pecans were kept at 34 to 38 degrees conflicted with the depositions of some Willmar Cookie employees. Evidence was also presented, however, that the mold was discovered as early as one day after they were sent by unrefrigerated truck from Georgia. The jury was competent to weigh the conflicting evidence and determine causation.

## II

■ Pippin Pecan also contends that Willmar did not present sufficient evidence to support the jury's determination that Pippin Pecan breached the implied warranty of fitness for a particular purpose provided under Minn.Stat. § 336.2–315 (1982). To establish breach Willmar Cookie had to prove:

(1) that Pippin Pecan had reason to know Willmar Cookie's particular purpose,

(2) that Pippin Pecan had reason to know that Willmar Cookie was relying on Pippin Pecan's skill or judgment to furnish appropriate goods, and

(3) Willmar Cookie's actual reliance.

*See id.;* R. White & J. Summers, § 9–9, at 358. Pippin Pecan had notice of the purpose for which the pecans would be used. Williams testified that Goedert called Pippin Pecan specifically looking for pecans to rebag for retail sale. The jury could have inferred reliance from the fact that Willmar Cookie had previously received, approved, and processed a shipment of pecans from Pippin Pecan. The jury could also have inferred that Willmar Cookie was relying on receiving pecans of reasonably similar quality to those in the sample and in the July shipment. Pippin Pecan, at the very least, had reason to know that Willmar was relying on receiving pecans fit to sell for human consumption.

## III

■ Pippin Pecan contends that Willmar Cookie did not give timely notice of the breach or of revocation. When goods have been accepted, the buyer must, within a reasonable time after a breach has been discovered or should have been discovered, "notify the seller of breach or be barred from any remedy." Minn.Stat. § 336.2–607(3)(a) (1982). Similarly, revocation of acceptance must be made within a "reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects." *Id.,* § 336.2–608(2). What constitutes a "reasonable time" is a jury question and depends on the facts and circumstances of the case. *See id.* § 336.-1–204(2); *Johannsen v. Minnesota Valley Ford Tractor Co. Inc.,* 304 N.W.2d 654, 657 (Minn.1981).

The jury found that Willmar Cookie gave notice to Pippin Pecan of a breach of warranty and revoked acceptance both within a reasonable period after it discovered or should have discovered the breach. Pippin Pecan contends the notice was unreasonable because it was not given by Willmar Cookie until two and a half months after acceptance of the goods, December 9, 1981, and the invoice accompanying the pecans stated that claims should be submitted within five days of delivery.

■ The record shows, however, that Goedert talked to a Pippin Pecan employee on October 5, 1981, four days after receiving the pecans. He told her about the mold, received instructions to set the bad pecans aside, and was assured that the problem would be remedied. This could be construed by the jury to constitute reasonable notice of breach. Even if the jury did not consider the October 5 call to be notice, it could have determined that the December 9 notice was reasonable because there was a delay before customer complaints reached Willmar Cookie, and the October 5

call had given Pippin Pecan preliminary notice of the problem.

## IV

Pippin Pecan also contends that because the pecans were perishable, Willmar Cookie breached a duty to sell them after revoking acceptance. Under Minn.Stat. § 336.2–603(1) (1982), a buyer who revokes acceptance has the same duties toward the goods as a buyer who rejects goods. This duty is to "follow any reasonable instructions received from the seller with respect to the goods and in the absence of such instructions to make reasonable efforts to sell them for the seller's account if they are perishable or threaten to decline in value speedily." *Id.*

■■■■ The jury could well have found Pippin Pecan's instructions to continue processing and set aside what was bad to be "reasonable instructions," which Willmar Cookie followed. In addition, by December 9 Willmar Cookie had already tried to sell a significant portion of the pecans, only to have customers return them with complaints. The jury could reasonably have believed Willmar Cookie's statement that the pecans had no value at that point and therefore imposed no duty on Willmar Cookie to sell them.

## V

Finally, Pippin Pecan contends that the trial court should have granted it a new trial on the ground of newly discovered evidence concerning the temperature at which Willmar Cookie's refrigerated storage area was kept. The trial court denied Pippin Pecan's request to introduce the evidence, made on the final day of trial after both parties had rested, saying that Pippin Pecan gave no reason why the evidence could not have been discovered at an earlier date.

A new trial may be granted on the basis of material evidence "which with reasonable diligence could not have been found and produced at the trial." Minn.R.Civ.P. 59.01(4). Granting of a new trial is ad-

dressed largely to the discretion of the trial court. *Hertz v. Hertz,* 304 Minn. 144, 229 N.W.2d 42, 44 (1975). The Minnesota Supreme Court has determined that the granting of a new trial on the ground of newly discovered evidence requires a showing

that the evidence could not have been discovered through the exercise of due diligence before the trial; that at the time of trial the evidence was not within petitioner's or his counsel's knowledge; that the evidence is not impeaching, cumulative, or doubtful; and that it is likely to produce a different result.

*Vikse v. Flaby,* 316 N.W.2d 276, 284 (Minn. 1982).

■■■■ There was no showing that the evidence concerning the refrigeration temperature could not have been discovered through the exercise of due diligence before the trial or that at the time of trial it was not within Pippin Pecan's or its counsel's knowledge. Furthermore, the evidence is merely impeaching because two Willmar Cookie employees had already testified about the cold storage temperature. Although the evidence suggested some mishandling by Willmar Cookie, it was not likely to produce a different result, considering that the pecans were moldy when they were received.

## DECISION

The evidence was sufficient to support the jury's determination that Pippin Pecan breached the implied warranties of merchantability and of fitness for a particular purpose, that the notice given Pippin Pecan was reasonable, and that Willmar Cookie did not breach any duty of care owed to the rejected goods. The trial court did not err in denying Pippin Pecan's motion for a new trial based on newly discovered evidence.

Affirmed.