SWECO, INC., d/b/a Sweco Oilfield Services, Inc., Appellant,

v.

CONTINENTAL SULFUR AND CHEMICAL, Appellee.

No. 08–89–00411–CV.

Court of Appeals of Texas, El Paso.

Feb. 27, 1991.

Rehearing Overruled April 3, 1991.

Carl Robin Teague, San Antonio, for appellant.

J. Michael Black, Gene F. Creely, II, Boswell & Hallmark, Houston, for appellee.

Before OSBORN, C.J., and WOODARD and KOEHLER, JJ.

## OPINION

OSBORN, Chief Justice.

This appeal is from a judgment, based upon a jury verdict, awarding damages arising from the sale of a grinding mill which was to be used to process sulfur for sale in small particles. We affirm in part and reverse and render in part.

## FACTS

Continental Sulfur and Chemical is in the business of purchasing, processing and selling sulfur and other chemicals. Initially, the company bought and sold molten sulfur. In 1985, it built a plant to process molten sulfur into processed sulfur for sale to specialty manufacturers. This process whereby the solid sulfur was reduced into small particles produced a product which was unusable and had no value without further processing. This "remelt" represented fifteen percent to twenty percent of the plant production. As production increased, there was a need to make use of this part of the production which had no value. Continental decided to further process the remelt by a grinding process so as to make it marketable.

Continental sent a sample of this product to a Sweco lab for testing. Continental advised as to the desired particle size and the desired production rate. Sweco tested the sample and sent back a comprehensive lab report. Continental representatives went to visit the lab and investigate the operation of its grinding mills. They were shown a demonstration of the equipment. It was their testimony that Sweco personnel represented that the Sweco DM10 grinding mill would produce 3,200 pounds of ground sulfur per hour through an 80–mesh screen which would give Continental a product that it could sell. Continental purchased the Sweco mill and it was installed in its plant in May 1986.

After it was placed in operation, the mill would not produce more than 800 pounds of ground sulfur per hour, or about twenty-five percent of its represented capacity. In November and December of 1986, Sweco personnel visited the Continental plant, but they were not able to increase production using the DM10 mill. In March 1987, Continental purchased a used Sweco DM70 grinding mill. This mill produced 1,800 pounds of ground sulfur per hour, or four percent of its anticipated capacity. In addition to lack of production, each of these mills failed to produce the quality of product required for sale. Ultimately, Continental ceased grinding sulfur with each one of the Sweco mills.

## VERDICT

In answer to questions submitted to the jury, they found (1) that Sweco represented to Continental, at the time of the sale of the DM 10 grinder, that it would grind 8,000 pounds of sulfur per hour and forty percent would pass through an 80–mesh screen; (2) that the representation was false; (3) failed to find that the representation was made for the purpose of inducing Continental to purchase the grinder; (4) that Continental relied on the representation in purchasing the grinder; (5) that Continental would not have purchased the grinder but for the representation; (6) that the representation was a material term of the agreement to purchase the grinder; (7) that the representation by Sweco constituted an express warranty to Continental; (8) failed to find that Sweco knowingly represented that the grinder had characteristics, uses and benefits which it did not have; (9) that Sweco knowingly failed to disclose to Continental facts material to its decision to purchase the grinder; (10) damages result-

ing from disparity between the purchase price of the grinder and its value of $17,425.00, for loss of profits of $263,916.00 and to reputation of $34,650.00; (11) attorney's fees of $196,000.00; and (12) additional damages of "0".

This case was submitted to the jury upon three separate causes of action: (1) false misrepresentations; (2) breach of an express warranty; and (3) violations of the Deceptive Trade Practices Act. The damage issue was not conditionally submitted upon any liability findings but was submitted to reflect damages arising from each cause of action. The additional damages were dependent upon a finding of a violation of the Deceptive Trade Practices Act. The Appellant presents points of error which relate to each of these causes of action as well as the damages found by the jury.

### FALSE REPRESENTATIONS

In *Oilwell Division, United States Steel Corporation v. Fryer*, 493 S.W.2d 487 (Tex.1973), the Court recognized that where the representation is made for the purpose of inducing another to act, an essential element of the cause of action is *"that he made it with the intention that it should be acted upon by the party."* Both the opinion in *Fryer* and the subsequent opinion in *Custom Leasing, Inc. v. Texas Bank and Trust Company of Dallas*, 516 S.W.2d 138 (Tex.1974), which announced the same rule of law, cited the rule as set forth in *Wilson v. Jones*, 45 S.W.2d 572 (Tex.Comm'n App.1932, holding approved). The Appellee failed to obtain a favorable finding in Question No. Three on an essential element of this cause of action and there can be no recovery for false representations. Point of Error No. One is sustained.

### EXPRESS WARRANTY

In connection with Question No. Seven, the court instructed the jury as to the meaning of the term express warranty. The definition is the exact language from Tex.Bus. & Com.Code Ann. § 2.313 (Vernon 1968) except for paragraph (a)(3) which

deals with a sample or model and which had no application in this case. In *Morris v. Adolph Coors Company*, 735 S.W.2d 578 (Tex.App.—Fort Worth 1987, writ ref'd n.r.e.), the Court set out six elements of breach of an express warranty. Unlike the cause of action for false representations, there is no specific element that a representation be made with the intention that it should be acted upon by the other party. Instead, there is a requirement that the affirmation of fact or promise became a part of the basis of the bargain. *Id.* at 587. The Code in Section 2.313(a)(1) requires that the affirmation of fact or promise "becomes part of the basis of the bargain." Does becoming a part of the basis of the bargain mean that it must have been made for the purpose of inducing the purchaser to buy the item sold? We conclude that the answer is "No." We also recognize there is little authority on this precise question. Comment 3 to Section 2.313 states that no specific intention to make a warranty is necessary and that no particular reliance on such statements need be shown. This particular language of the Code is discussed in D. Whitman, *Reliance as an Element in Product Misrepresentation Suits: A Reconsideration*, 35 Sw.L.J. 741, 747 et seq. (1981). After recognizing some confusion from the language "basis of the bargain", the author on page 750 states:

> If there was an affirmation of quality in the statements, although the buyer did not rely upon this affirmation in making the purchase, he still arguably has a cause of action under breach of express warranty. The basic test is: Did the affirmations of fact or promises made by the seller ... become a part of the basis of the bargain? If so, an express warranty has been created. If not, no express warranty exists.

In J. White and R. Summers, *Uniform Commercial Code*, § 9–5, 3d ed. (1988), the authors note that the Code omits any explicit mention of reliance and requires only that the promise or affirmation become "part of the basis of the bargain." They recognize confusion inherent in the basis of the bargain test because those terms have

no generally understood legal meaning. 3 R. Anderson, *Uniform Commercial Code*, 3d ed. (1983) concludes that whether there is an express warranty is to be determined on the basis of the intention of the parties and that an objective intent is the test. The author concludes that "[i]t is therefore immaterial that the seller did not specifically intend to warrant, when in fact the statement or element was made part of the basis for the bargain." Section 2–313:36 and Section 2–313:37.

In *Easton Farmers Elevator Company v. Chromalloy American Corporation*, 310 Minn. 568, 246 N.W.2d 705 (1976), the Court reviewed a case in which there had been representations that a particular dryer would dry corn at the rate of 1,500 bushels per hour. When installed, its capacity was only 400 to 500 bushels per hour. The Court concluded that statements about the bushels-per-hour performance of the corn dryer clearly constituted an express warranty which was central to the negotiated bargain between the parties and was part of the "basis of the bargain" and an express warranty under the Code.

The Court in *Valley Datsun v. Martinez*, 578 S.W.2d 485 (Tex.Civ.App.—Corpus Christi 1979, no writ), considered whether a salesman's statements about a used car resulted in an express warranty under the Code. The Court said:

> The test of whether a salesman's statement constituted 'affirmations of fact' going to the very 'basis of the bargain' is whether the salesman was asserting a fact of which the buyer was ignorant, or whether he was merely declaring his belief with reference to a matter of which he had no special knowledge and of which the buyer may also have been expected to have an opinion.

We conclude that in this case, the sample was sent to Sweco for the purpose of testing its own equipment. Based upon its own testing procedures, Sweco made representations as to the capacity at which its mill would perform. Without any special knowledge as to those tests, Continental relied upon the representations made when they purchased the DM10 mill. An express

warranty was created regardless of whether the representations were made to induce the sale. Point of Error No. Two is overruled.

## DECEPTIVE ACTS

■ In answer to Question No. Nine, the jury found that Sweco knowingly failed to disclose to Continental facts material to its decision to purchase the grinder. Tex.Bus. & Com.Code Ann. § 17.46(b)(23) (Vernon 1987) provides that it is an unlawful act to fail to disclose information concerning goods or services which were known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed. The Appellant objected to the issue as submitted which did not include the "intended to induce" element. The jury failed to find an intent to induce in answer to Question No. Three. Without a favorable finding, Continental has not established the necessary elements for a recovery under Section 17.46(b)(23). Point of Error No. Three is sustained.

## DAMAGES

### (A) Reputation

■ In two points of error, the Appellant contends that there is no evidence or insufficient evidence to support the finding of damages to reputation and the award of $34,650.00 for such damages. There was no independent ground of recovery submitted to the jury for findings as to whether there was conduct which resulted in an injury to the reputation of the Appellee. Where some elements of a cause of action are not submitted, it must be presumed that the trial court found the necessary elements to support the judgment entered if there is factually sufficient evidence to support a finding thereon. Tex.R.Civ.P. 279. In this case, the trial court made findings of fact after the verdict and found that Sweco did not make, publish or communicate to any third person any oral or written statement which was defamatory, slanderous, libelous or disparaging of the

...

reputation of Continental. There is no cross-point of error attacking the findings of the trial court. Without favorable jury findings and with adverse court findings, we conclude that the Appellee cannot recover damages for injury to its reputation. We sustain Point of Error No. Four. Point of Error No. Ten becomes immaterial to our decision.

(B) Loss of Profits

■ The Appellant contends in its next two points of error that the trial court erred in its submission of the instructions given in connection with the issue of loss of profits, and that there is no evidence and insufficient evidence to support the jury finding of damages of $263,916.00 for loss of profits. Under the no evidence contention, we look only at that evidence which supports the jury verdict and the reasonable inferences therefrom and reject all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821 (Tex. 1965). Under the insufficient evidence challenge, we consider all the evidence, including that which is contrary to the verdict. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). The jury's finding must be sustained if there is some evidence of probative value to support it and it is not against the great weight and preponderance of the evidence. *Carrasco v. Goatcher*, 623 S.W.2d 769 (Tex.App.—El Paso 1981, no writ). The evidence from witnesses called by Continental reflected that when it purchased the grinding mill from Sweco, it was anticipated that the mill would produce 3,200 pounds of ground sulfur per hour through a 80–mesh screen. When placed into operation in the spring of 1986, the very best production was never more than 800 pounds per hour. When the representatives of Sweco tested the mill in November and December, the results were about 500 pounds per hour. In an attempt to remedy the problem, Continental bought a used DM70 Sweco mill and while it produced 1,800 pounds per hour, that was far below anticipated capacity and the quality of production was unsatisfactory and eventually production ceased. The company did sell some ground sulfur while using the two Sweco mills, including 20 tons in 1986, 615 tons in 1987, 515 tons in 1988 and 130 tons in 1989. Had the DM10 mill produced as anticipated at 3,200 pounds an hour for an 8 hour day and 300 work days, production would have been 3,840 tons a year. Mr. Boone testified that the profit on the ground sulfur sold was $86.00 per ton. That would have resulted in a profit of $330,240.00 per year. The jury award for the three full years of operation was less than the company expected to make each of those years, even without considering future loss of profits. The evidence is sufficient to support the award. Point of Error No. Five is overruled.

■ In connection with the damages issue, Appellant asserts the trial court erred in failing to submit requested instructions on "special damages", "ordinary care" and "net profits". First, we note that "special damages" was not used in the court's charge and there was no need to define that term. *Barnhouse Motors, Inc. v. Godfrey*, 577 S.W.2d 378 (Tex.Civ.App.—El Paso 1979, no writ). Likewise, no definition is required for commonly used terms which are included in trial instructions. *Holmes v. Holmes*, 588 S.W.2d 674 (Tex. Civ.App.—Beaumont 1979, no writ). In *Copenhaver v. Berryman*, 602 S.W.2d 540 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.), the Court noted that the term "net profits" is to a large degree self-explanatory. In this case, Mr. Boone was cross-examined extensively about how he arrived at net profit, and the jury had to be aware that the cost of operations were subtracted from gross sales to arrive at a net profit. Point of Error No. Six is overruled.

(C) Equipment Purchase Price

■ The next three points of error relate to the issue submitted which inquired as to the disparity between the purchase price of the DM10 grinder and its value to Continental. The jury found this item of damage to be $17,425.00, which was the purchase price paid for that equipment. The common law measure of damages is the difference between the market value of

the property as warranted and the market value of the property as delivered. *Integrated Title Data Systems v. Dulaney,* 800 S.W.2d 336 (Tex.App.—El Paso 1990, no writ); *Mercedes–Benz of North America, Inc. v. Dickenson,* 720 S.W.2d 844 (Tex.App.—Fort Worth 1986, no writ). That standard has been codified as part of the law of Sales. Tex.Bus. & Com.Code Ann. § 2.714. Proof of the contract purchase price, standing alone, is sufficient to support a finding that that amount was the fair market value as warranted by the seller. *Integrated Title Data Systems v. Dulaney,* 800 S.W.2d at 336. The proof was sufficient to establish that the mill as warranted, with an estimated production of 3,200 pounds of ground sulfur per hour, had no value at the actual production rate. The jury finding, based upon the sales price with no market value as delivered and based upon the warranty as to production, was supported by the evidence. *Id.* We conclude that under the evidence, the purchase price ends up being the actual measure of damages. *Raye v. Fred Oakley Motors, Inc.,* 646 S.W.2d 288 (Tex.App.—Dallas 1983, writ ref'd n.r.e.).

 Appellant also contends the trial court erred in failing to properly instruct the jury on the measure of damages and in particular in failing to give a requested instruction on "value." The jury was asked to find in dollars and cents or zero the "[d]isparity between the purchase price of the DM10 grinder and its value to Continental Sulfur." There was no dispute as to the purchase price. The jury was at liberty, based upon the evidence, to find the value to Continental. The mill was shut down. A larger mill was purchased. It was shut down. Grinding of sulfur for resale was discontinued. The jury was finding damages caused by the representations, if any, of Sweco. We find no error in failing to define market value. Granted, the grinder as sold and delivered probably had some market value, but based upon the representations made at the time of the sale, the jury could find it had no value to a company engaged in grinding sulfur for a commercial market. Points of Error Nos. Seven, Eight and Nine are overruled.

**(D) Reputation and Attorney's Fees**

Point of Error No. Ten is an attack upon the evidence which supports the damages for injury to reputation. That complaint is now moot. The last complaint is upon the award of attorney's fees and contends that if damages are not allowed, these fees should be disallowed. We have affirmed in part the award of damages and the attorney's fees cannot be set aside. Point of Error No. Eleven is overruled.

## CONCLUSION

We affirm that part of the judgment of the trial court which awards damages for the purchase price of the DM10 grinder, for loss of net profits and for attorney's fees. We reverse that part of the judgment which awards damages for injury to reputation and render judgment denying recovery for such element of damages in this case. All costs are taxed against the Appellant.