C & C PARTNERS, Eugene E. Caldwell, William E. Campbell, Campbell Company, Ltd., C & C Partners 1983 Drilling Fund, C & C Partners—1983A, C & C Partners—1983B, C & C Partners—1983C, C & C Partners—1983D, and C & C Partners—1983E, Appellants,

v.

SUN EXPLORATION AND PRODUCTION COMPANY, Appellee.

No. 05-89-00185-CV.

Court of Appeals of Texas, Dallas.

Dec. 29, 1989.

Rehearing Denied Feb. 6, 1990.

Jerome J. Schiefelbein, La Jolla, Cal., G. Leroy Street, John T. Palter, Gregg A. Cooke, Dallas, for appellants.

Cynthia Hollingsworth, Joe B. Harrison, David Gibson, Dallas, for appellee.

Before STEWART, ROWE and BURNETT, JJ.

## OPINION

ROWE, Justice.

C & C Partners, Eugene E. Caldwell, and others (hereinafter referred to as C & C or Caldwell) appeal from an adverse judgment rendered in a suit filed by Sun Exploration and Production Company. Sun had asserted claims of breach of contract and fraudulent misrepresentation. C & C, by means of a counterclaim, alleged that Sun had violated the Texas Deceptive Trade Practices Act (DTPA). On appeal, C & C raises a number of points of error regarding the DTPA counterclaim, contractual consent, legal and factual sufficiency of evidence, the grant of a partial summary judgment, the fraudulent misrepresentation claim, prejudgment interest, and the proper parties to the lawsuit. With respect to the judgment for fraud, we reverse and render a take nothing judgment; as to prejudgment interest, we reverse and remand for further proceedings; in all other respects, we affirm the judgment of the trial court.

## FACTS

Caldwell, on behalf of C & C Partners, entered into three exploration and joint operating agreements with Sun. According

to the exploration agreements, C & C Partners and Sun agreed to jointly participate in oil and gas operations in three drilling prospects, the "East Wilson Creek," the "South Alamo," and the "Atlee." The terms of the agreements provided that Sun would drill a test well on each prospect. C & C agreed to pay 66.67 percent of all costs of drilling a test well to casing point.[1] After casing point, all costs, other than plugging, abandonment, and surface restoration costs, were to be borne 50 percent by Sun and 50 percent by C & C, "subject to the right of any party to elect to go nonconsent pursuant to the terms and provisions of [the] Operating Agreement." If no completion attempt of a test well was made, costs of plugging, abandoning, and surface restoration were to be borne 66.67 percent by C & C and 33.33 percent by Sun. If attempts to complete a test well were unsuccessfully made, resulting in a dry hole, C & C and Sun would each bear 50 percent of the costs after casing point. If a test well could not reach contract depth, the parties could mutually agree to drill a substitute well. The operating agreement covering the South Alamo prospect had a provision allowing the drilling of additional wells in order to earn acreage.

The initial test wells drilled on the South Alamo and Atlee prospects were named Booth No. 1 and Dietert No. 1 respectively. The test well on the East Wilson Creek prospect was originally proposed to be located on a certain lease but was later moved to another lease and renamed Union Carbide No. 1. The Union Carbide No. 1 sustained a partial blowout, and a substitute well called Union Carbide No. 1–A was drilled on the East Wilson Creek Prospect. Two additional wells were drilled on the South Alamo prospect in order to earn more acreage. They were named Whitley No. 1 and Dooley No. 1.

Sun sued C & C to recover C & C's unpaid share of the drilling and plugging costs for the Union Carbide No. 1, the completion costs for the Booth No. 1 and the Dietert No. 1, and the drilling and completion costs for the Union Carbide No. 1–A, the Whitley No. 1, and the Dooley No. 1. C & C denied liability and counterclaimed for damages under the Texas Deceptive Trade Practices Act. See TEX.BUS & COM.CODE ANN. §§ 17.41–17.63 (Vernon 1987). The trial court granted a partial summary judgment in Sun's favor with respect to the costs attributable to the completion and first fracture stimulation of the Booth well. After the presentation of all the evidence, the trial court granted an instructed verdict in Sun's favor on C & C's DTPA counterclaim on the ground that C & C and the other defendants were not consumers as defined by the DTPA. Based on the jury's findings, the trial court rendered judgment in favor of Sun for breach of contract and fraudulent misrepresentation and awarded actual damages, punitive damages, prejudgment interest, and attorneys' fees. C & C's motion for new trial was overruled.

## DTPA COUNTERCLAIM

In its first two points of error, C & C contends that the trial court erred in granting Sun's motion for instructed verdict with respect to C & C's DTPA counterclaim. C & C argues that fact issues existed as to its status as a consumer and that Sun failed to establish as a matter of law that C & C and the other appellants were not consumers.

One may not be subjected to a private suit for damages under the DTPA unless the allegedly aggrieved party is a consumer. One who maintains a private lawsuit under section 17.50 of the DTPA (providing a private right of action for consumers) must be a consumer as defined in section 17.45(4). *Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 173 (Tex.1980); *see* TEX.BUS. & COM.CODE ANN. § 17.50 (Vernon 1987). Under the DTPA, a consumer is defined, in pertinent part, as "an individual, partnership, [or] corporation ... who seeks or acquires by purchase or lease, any goods

1. The agreements defined "casing point" as "that point in time when the test well has reached contract depth, has been cored, tested, logged and the decision has been made to run casing and attempt completion, or that time when all of the parties have elected to plug and abandon the test well pursuant to the terms and provisions of the Operating Agreement."

or services." TEX.BUS. & COM.CODE ANN. § 17.45(4) (Vernon 1987). A plaintiff establishes his standing as a consumer in terms of his relationship to a transaction, not by a contractual relationship with the defendant. *Birchfield v. Texarkana Memorial Hosp.*, 747 S.W.2d 361, 368 (Tex.1987). In order to establish its status as a consumer under the DTPA, a plaintiff must show (1) that it sought or acquired goods or services by purchase or lease and (2) that the goods or services purchased or leased form the basis of the complaint under the DTPA. *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 351–52 (Tex.1987).

C & C contends that it purchased services and materials from Sun and that it was, therefore, a consumer. Based on this contention, C & C argues that the trial court erred in granting Sun's motion for instructed verdict regarding C & C's DTPA counterclaim.

■■■ In reviewing the propriety of an instructed verdict, we determine whether there is any evidence of probative force to raise fact issues on the material questions presented. We consider all of the evidence in the light most favorable to the party against whom the verdict was instructed, disregarding all contrary evidence and inferences. *Henderson v. Travelers Ins. Co.*, 544 S.W.2d 649, 650 (Tex.1976). An instructed verdict is proper if the evidence proves conclusively the truth of fact propositions which, under the substantive law, establish the right of the movant, or negate the right of his opponent, to judgment. *Fort Worth State School v. Jones*, 756 S.W.2d 445, 446 (Tex.App.—Fort Worth 1988, no writ); *Riley v. Powell*, 665 S.W.2d 578, 580 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.). A directed verdict is warranted when the evidence is such that no other verdict can be rendered and the moving party is entitled, as a matter of law, to judgment. *Wright v. General Motors Corp.*, 717 S.W.2d 153, 155 (Tex.App.—Houston [1st Dist.] 1986, no writ).

■■ The evidence, viewed in the light most favorable to C & C, showed that C & C was billed for its share of administrative costs incurred by Sun, including the admin-istrative costs associated with engineers, geologists, maintenance of buildings, and accounting. The joint operating agreements provided that the joint account of the operator (Sun) and the nonoperators (C & C) would be charged for items such as the labor costs of Sun's field employees, for the materials purchased or furnished for use on the prospect properties, and for the costs of services provided by contract personnel on the prospect properties.

Sun contends that *Hamilton v. Texas Oil & Gas Corp.*, 648 S.W.2d 316 (Tex.App.—El Paso 1982, writ ref'd n.r.e.), controls this case and establishes that C & C was not a DTPA consumer as a matter of law. The *Hamilton* case involved a suit between an operator (TXO) and a nonoperator working interest owner who had entered into a joint operating agreement. TXO sued to collect the nonoperator's share of drilling costs. The nonoperator denied liability and counterclaimed for damages for alleged deceptive trade practices. These facts are virtually identical to the facts of the instant case, Sun being the operator and C & C being the nonoperator.

In the *Hamilton* case, the trial court disregarded the jury finding that the nonoperator was a consumer within the meaning of section 17.45(4) of the DTPA. *Hamilton*, 648 S.W.2d at 321–22. On appeal, the nonoperator argued that TXO had rendered operator's services to the nonoperator and had been paid for those services. Those services included directing and controlling all operations, paying costs, and providing management, bookkeeping, and supervision. *Id.* at 322. We conclude that the services rendered by TXO in the *Hamilton* case were of the same character as the services rendered by Sun in this case. Those services were basically administrative, managerial, and supervisory.

> The *Hamilton* court determined that: TXO was simply reimbursed for costs incurred on behalf of the operating and non-operating interest owners. [The nonoperator] did not employ TXO. Rather, there was merely a consolidation of interests. TXO was the "front man" incurring the debts for all, for which it was

entitled to be reimbursed. That TXO did not intend to make a profit for what it did is a factor to be weighed.... The purpose of operating agreements, being to spread the risk of drilling operations among several investors with the operator managing the books and making disbursements from a joint account for the benefit of all involved in the [joint operating agreement], should not be construed, we believe, to create liabilities under the [DTPA]. We hold that under the facts of this case, [the nonoperator], as a matter of law, was not a "consumer" of services as contemplated within the [DTPA] and that the trial court was not in error in disregarding the jury finding to the contrary.

*Id.*

We have examined the record in the light most favorable to C & C. The evidence showed that C & C was billed for its share of administrative costs incurred by Sun on behalf of all of the parties. The parties' joint account was charged for labor costs, materials, and services. There was evidence that C & C was prebilled for its share of some anticipated future costs, as authorized by the joint operating agreements, but we do not view this as a material distinction (if it is indeed a distinction) between this case and the *Hamilton* case. Uncontradicted testimony showed that Sun sought reimbursement for costs incurred on behalf of the operating and nonoperating interest owners and that Sun did not make a profit when it charged for these costs. Under these circumstances, we determine that *Hamilton* is dispositive. No fact issues were raised on the *material* questions involved. *See Henderson*, 544 S.W.2d at 650. On the other hand, fact propositions were conclusively established which, under the substantive law, entitled Sun to judgment and negated C & C's right to judgment. *See Jones*, 756 S.W.2d at 446; *Wright*, 717 S.W.2d at 155; *Riley*, 665 S.W.2d at 580. As a matter of law, we hold that C & C was not a consumer under the DTPA. *See Hamilton*, 648 S.W.2d at 322. Based on *Hamilton*, we conclude that the trial court did not err in directing a verdict for Sun on C & C's DTPA counterclaim. We therefore overrule C & C's first and second points of error.

■ In its third and fourth points of error, C & C asserts that the trial court erred in excluding testimony regarding Sun's "workmanship," arguing that the testimony was admissible on an element of C & C's DTPA cause of action. However, because C & C was not entitled to maintain its DTPA cause of action, the excluded testimony was irrelevant and, therefore, inadmissible. *See* TEX.R.CIV.EVID. 401, 402. When a litigant has failed to establish its right to prevail on a claim, the exclusion of evidence concerning that claim does not constitute reversible error because such evidence is immaterial. *KIKK, Inc. v. Montgomery County Broadcasting, Inc.*, 516 S.W.2d 494, 496 (Tex.Civ.App.—Beaumont 1974, no writ); *see Turner v. Monsanto Co.*, 717 S.W.2d 378, 381 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). The exclusion of the testimony offered by Sun was not erroneous since no substantial right of Sun was affected. *See* TEX.R.CIV. EVID. 103(a). We overrule the third and fourth points of error.

## CONTRACTUAL CONSENT

In its fifth point of error, C & C contends that the trial court erred in excluding testimony about industry practice regarding the use of authorizations for expenditures (AFEs) to obtain consent for drilling and completion expenditures. The crux of C & C's argument on appeal is that Caldwell, on the other appellants' behalf, did not consent to the operations for which Sun seeks recovery of C & C's share of the costs. C & C maintains that such consent was a condition precedent to its liability. The excluded testimony, preserved by means of a bill of exceptions, was to the effect that the consent requirements of the operating agreements, as incorporated in the exploration agreements, had to be evidenced in writing by means of AFEs. According to C & C, since no AFEs evidencing consent were introduced into evidence, C & C was not liable because of the failure of a condition precedent.

Sun argues that the excluded testimony was inadmissible parol evidence. C & C responds that the excluded testimony was not offered to alter the provisions of the joint operating agreements, but to "explain certain provisions in light of industry practice." The pertinent provisions of the joint operating agreements stated:

> The parties receiving such a notice [of proposed operations] shall have thirty (30) days after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday or legal holidays. Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or response given by telephone shall be promptly confirmed in writing.

■ In the absence of fraud, accident, or mistake, extrinsic evidence will not be received if its effect is to vary, add to, or contradict the terms of a written contract that is complete in itself and unambiguous. The intent of the parties must ordinarily be ascertained from the contract alone. *Paxton v. Spencer*, 503 S.W.2d 637, 642–43 (Tex.Civ.App.—Corpus Christi 1973, no writ). The parol evidence rule is not a mere rule of evidence but is a rule of substantive law. Absent pleading and proof of ambiguity, fraud, accident, or mistake, a written contract is presumed to contain all agreements of the parties relating to the transaction. The provisions of the contract will be enforced as written and cannot be added to, varied, or contradicted by parol evidence. *Weinacht v. Phillips Coal Co.*, 673 S.W.2d 677, 679 (Tex.App.—Dallas 1984, no writ).

C & C did plead fraudulent inducement, but the alleged misrepresentation concerned the location of the Union Carbide No. 1 well. Moreover, C & C was allowed to present evidence of this alleged misrepresentation, and C & C does not now complain that it was not allowed to offer evidence of the fraud that it pleaded. C & C's pleading of fraudulent inducement thus had nothing to do with the contract provisions regarding consent, and there was no exclusion of evidence concerning the alleged fraud on the ground that such evidence was inadmissible parol evidence. We therefore determine that C & C's allegation of fraudulent inducement provided no basis for admission of unrelated parol evidence concerning the manner of giving consent to proposed operations.

■ C & C did not plead accident or mistake, nor did it allege that the contracts were ambiguous. The question of whether a contract is ambiguous is a question of law to be decided by the court. *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex.1980). If a written contract is so worded that a court may properly give it a certain or definite legal meaning or interpretation, it is not ambiguous. A contract is ambiguous only when the application of pertinent rules of interpretation result in genuine uncertainty as to which one of two or more meanings is the proper meaning. *Id.* at 519; *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 517, 243 S.W.2d 154, 157 (1951). The primary concern in interpreting a contract is ascertaining and giving effect to the intentions of the parties as expressed in their agreement. *R & P*, 596 S.W.2d at 518. Although the entire contract should be considered so that its parts are interpreted together with all other parts, the parties' intent concerning a particular matter may be determined from only one portion of the contract. *Monesson v. Champion Internat'l Corp.*, 546 S.W.2d 631, 636 (Tex.Civ.App.—Tyler 1976, writ ref'd n.r.e.). A contract is to be interpreted in accordance with its plain language. *General Am. Indem. Co. v. Pepper*, 161 Tex. 263, 264, 339 S.W.2d 660, 661 (1960).

■ We conclude that the contract provisions regarding consent are unambiguous. The contracts clearly require consent, but they do not specify that any par-

ticular form of consent is required. Consent by telephone is permitted but not required under certain circumstances. Any telephoned notice or response (consent or nonconsent) is required to be confirmed in writing. Thus, the only requirement of a writing is in the case of *confirmation of consent or nonconsent* or confirmation of notice of a proposed operation. Confirmation of consent is obviously distinct and separate from consent itself, as to which there is no requirement of a writing. Moreover, the contract plainly does not state that consent is invalid or ineffective if it is not confirmed in writing. The provisions on consent also contain absolutely nothing about AFEs.

Thus, the contracts may properly be given a certain or definite legal meaning or interpretation and are, therefore, unambiguous. *See R & P,* 596 S.W.2d at 519; *Universal C.I.T.,* 243 S.W.2d at 157. Since the contracts are unambiguous, we are required to give effect to the intention of the parties as expressed in their writing. The parties' objective, not subjective, intent controls. *See City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518 (Tex.1968). We think that the evidence offered by C & C would have clearly added to or varied the provisions on consent. Whereas those provisions did not require any particular form of consent, the evidence excluded by the trial court was offered to support insertion of a requirement that consent be in writing in the form of an AFE. Since the contracts are unambiguous, such parol evidence was properly excluded. *See Universal C.I.T.,* 243 S.W.2d at 157; *Weinacht,* 673 S.W.2d at 679; *Paxton,* 503 S.W.2d at 642–43. We overrule C & C's fifth point of error.

In points of error six through eight, C & C contends that the trial court erred in refusing to submit to the jury three questions requested by C & C. The first two requested questions asked if Sun had failed to obtain written consent prior to incurring costs and expenses of drilling, completing, and/or plugging and abandoning three of the wells at issue in this case. The third question, to be answered only if the jury had answered "yes" as to any of the well operations mentioned in the previous two questions, asked if the obtaining of written consent was a condition precedent to C & C's obligations with respect to all six of the wells at issue in this case. C & C maintains that the questions should have been submitted because industry practice requires written authorization or confirmation as a condition to liability.

As discussed previously, we have determined that the exploration and operating agreements were unambiguous and did not require written authorization or consent as a condition precedent. Moreover, evidence that industry practice required such written consent was properly excluded. If a contract is not ambiguous, its interpretation is a question of law to be decided by the court. *City of Pinehurst,* 432 S.W.2d at 518. In our view, it is elementary that questions of law generally should not be submitted to a jury. *See Ellis v. Waldrop,* 627 S.W.2d 791, 796 (Tex.App.—Fort Worth 1982), *aff'd in part and rev'd in part on other grounds,* 656 S.W.2d 902 (Tex.1983) (question requiring jury to interpret instruments and determine their legal effect should not be asked, and answer to such question will not support judgment based on jury's finding); *cf. Medical Towers, Ltd. v. St. Luke's Episcopal Hosp.,* 750 S.W.2d 820, 826 (Tex.App.—Houston [14th Dist.] 1988, writ denied) (submission of question of law to jury is harmless error absent showing of prejudice). Therefore, the trial court clearly did not err in refusing to submit C & C's third requested question. The question of whether written consent was a condition precedent was a question of law to be determined by the court based on the unambiguous terms of the contracts.

■ We conclude that the other two questions requested by C & C asked about immaterial factual issues and therefore did not have to be submitted. The two questions asked if written consent had been obtained, whereas the agreements between the parties did not require written consent. A trial court is required to submit only ultimate or controlling factual issues which are essential to a right of action or defense. Questions that are not ultimate or control-

ling need not be submitted; if they are submitted, they may be disregarded as immaterial. *Clark v. McFerrin,* 760 S.W.2d 822, 825–26 (Tex.App.—Corpus Christi 1988, writ denied); *Perales v. Braslau's Furniture Co.,* 493 S.W.2d 638, 640 (Tex. Civ.App.—Corpus Christi 1973, writ ref'd n.r.e.). *See generally* W. DORSANEO, 5 TEXAS LITIGATION GUIDE § 122.03[2] (1989). Since the exploration and operating agreements did not require written consent, and since evidence of such a requirement under industry practice was properly excluded, the questions as to whether Sun obtained written consent were not essential to any right of action or defense, and they did not inquire about ultimate or controlling factual issues.

The trial court properly refused to submit C & C's requested jury questions. We overrule points of error six through eight.

### SUFFICIENCY OF EVIDENCE

In points of error nine through twelve, C & C argues that the trial court erred in overruling its motion for new trial because there was no evidence or insufficient evidence supporting the jury's answers to the first four questions submitted to the jury. In answer to the first question, the jury found that C & C's unpaid share of the drilling (or before casing point) costs for the Dietert No. 1 well was $6,608. The jury answered the second question by finding that C & C had consented to participate in the drilling of the Union Carbide No. 1, the Union Carbide No. 1–A, the Dooley No. 1, and the Whitley No. 1 wells. The jury also found that C & C's unpaid shares of the drilling (or before casing point) costs with respect to each well were $296,481, $846,806, $311,756, and $281,407 respectively. In its answer to the third question, the jury found that C & C had consented to participate in the completion of the Union Carbide No. 1–A, the Dooley No. 1, and the Dietert No. 1 wells. The jury found that C & C's unpaid shares of the completion (or after casing point) costs were $490,577, $287,546, and $146,771 respectively. In response to the fourth question, the jury found that C & C consented to participate in the second fracture job on the Booth No.

1 well and that C & C's unpaid share of the cost of that job was $12,125.

In reviewing a no evidence point of error, we are required to consider only the evidence and inferences which tend to support the jury's findings, disregarding all evidence and inferences to the contrary. *Jacobs v. Danny Darby Real Estate, Inc.,* 750 S.W.2d 174, 175 (Tex.1988). A no evidence point should be sustained only when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the only evidence offered to prove a vital fact is barred from consideration by rules of law or evidence; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *Stewart v. Chovanec,* 738 S.W.2d 776, 779 (Tex.App.—Fort Worth 1987, no writ). In reviewing a factual insufficiency point of error, we must consider and weigh all of the evidence, and we cannot set aside a jury finding unless it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (per curiam).

We rule on the no evidence points first. *See Glover v. Texas Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981). The record, considering only the evidence supporting the jury findings, shows that J.T. Smith, a Sun employee, was responsible for initiating drilling and completion operations concerning the wells at issue in this case. Smith testified that he undertook those operations under authorizations granted by Wesley Tiller, another Sun employee. According to Smith, he would never have been given such authorization if Caldwell, who acted on behalf of C & C, had not consented to the operations. Thus, there is some evidence supporting the jury's findings that C & C had consented to participate in the drilling and completion operations. As to the jury's findings of the unpaid amounts owed by C & C, a summary of monthly joint interest billings showing C & C's unpaid shares of costs (both before

casing point and after casing point) with respect to each well was admitted into evidence. The amounts found by the jury to be unpaid correspond to the amounts shown in the summary. Therefore, there is evidence supporting the jury's remaining findings in questions one through four. We overrule C & C's points of error nine through twelve insofar as those points complain that there was no evidence supporting the jury's findings.

In considering the factual insufficiency points, we examine all of the evidence in the record. The only evidence as to the unpaid amounts owed by C & C was contained in the summary discussed above and in the testimony of Thomas Carter, an accountant employed by Sun. That evidence supported the jury's findings with respect to unpaid amounts. Because there was no contrary evidence concerning the amounts owed, we certainly cannot say that the jury's findings were so contrary to the weight of the evidence as to be clearly wrong and unjust.

With respect to the jury's findings of consent, there was testimony from James McCormick, the president of Sun, to the effect that verbal consent is usually confirmed by an AFE. He also stated that "it was inconceivable to me that there wouldn't be some document supporting the decision to go forward." McCormick acknowledged the absence of confirming AFEs. He characterized AFEs as confirming documents, but he did not state that consent had to be written. A letter was introduced into evidence from Charles Measley, a Sun employee, to Caldwell that proposed certain testing operations with respect to the Union Carbide No. 1–A well. That letter stated that Caldwell had thirty days to notify Sun as to whether he elected to participate in the cost of the proposed operation, and it further advised him that "[y]our failure to notify us in writing within such time shall be deemed to be a non-consent to the proposed operation." Caldwell testified that he sometimes gave oral consent to proposed operations; stating that he had to follow up with written AFEs. However, Caldwell also testified

that he expected Sun to rely on his oral consent.

Smith testified that if Sun did not have the consent of Caldwell with respect to proposed operations, he and Tiller would have had to go to Sun's upper management in order to obtain funding for C & C's share of the costs. He said that he and Tiller never sought such funding from Sun's upper management concerning the wells and operations at issue in this case. As noted previously, Smith stated that he had authorization to undertake the proposed operations and that he would not have been given such authorization if Caldwell had not consented to the operations. A number of letters were also introduced into evidence that had been sent by Caldwell to members of the C & C limited partnerships. These letters constituted offers to participate in various operations at issue in this case. A fair and reasonable reading of the letters suggests that the operations referred to were not operations as to which Caldwell had withheld consent.

Having examined all of the relevant evidence, we determine that the jury's findings that C & C had consented to the well operations were not so against the overwhelming weight of the evidence as to be clearly wrong and unjust. In our view, the greater weight of the evidence supports the jury's findings. We overrule points of error nine through twelve insofar as those points complain that there was insufficient evidence to support the jury's findings.

## PARTIAL SUMMARY JUDGMENT

In its thirteenth point of error, C & C contends that the trial court erred in granting Sun's motion for partial summary judgment regarding C & C's consent to participate in the completion and first fracture stimulation job on the Booth well. C & C maintains that material fact issues existed concerning whether Caldwell consented to the expenses associated with the Booth well.

The purpose of summary judgment is to eliminate patently unmeritorious claims or untenable defenses and to avoid the delays of a trial when there are no genuine issues

of material fact. It is not intended to deprive litigants of their right to a full hearing on the merits concerning any real issues of fact. *In re Estate of Price*, 375 S.W.2d 900, 904 (Tex.1964). A summary judgment should be granted and, if granted, should be affirmed only if the summary judgment record establishes the movant's right thereto as a matter of law. *Gibbs v. General Motors Corp.*, 450 S.W.2d 827, 828 (Tex.1970); *see* TEX.R.CIV.P. 166a(c). The appellate standards of review are well established: (1) the movant has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law; (2) in deciding whether there is a disputed material fact issue, evidence favorable to the nonmovant will be taken as true; (3) every reasonable inference must be indulged in favor of the nonmovant and any doubts must be resolved in its favor. · *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985).

We conclude that Caldwell, in his deposition testimony which was part of the summary judgment evidence presented, admitted that he consented to the Booth well operations. The following exchange appears in the Caldwell deposition:

> Q. All right. Back to the flow of information line of questions, and let's start with the Booth well. After Mr. Smith or, excuse me, someone you can't recall, after you received a telephone conversation regarding completion of certain zones in that well, what happened next? Did you ask that person for any particular information regarding the completion of that well?
>
> A. I know I had serious discussion with Mr. Tiller about the Booth well when we found that it flowed naturally. I specifically requested that the well not be fracced *even though I had consented to fraccing it because I had to consent to the whole well or no part of it* but I said let's produce this one naturally and see what we get and not drill anything until we have some results.

(Emphasis added.) Thus, Caldwell admitted that he consented to the Booth well completion operations, including the fracture stimulation job.

C & C also argues that the summary judgment evidence showed that there was a material fact issue regarding whether consent was required to be in writing. However, the trial court had before it the contracts involved in this case, including the provisions on consent. As previously discussed, the contracts are unambiguous and do not require any particular form of consent. Interpretation of those contracts was a question of law to be decided by the court. Thus, there was no issue of fact as to the form of consent.

The trial court properly granted the partial summary judgment with respect to the completion and first fracture stimulation job on the Booth well. We overrule C & C's thirteenth point of error.

## FRAUDULENT MISREPRESENTATION

In point of error fourteen, C & C asserts that the trial court erred in entering judgment for both breach of contract and misrepresentation because such judgment constitutes a double recovery of damages. In point number fifteen, C & C contends that the trial court erred in entering judgment for punitive damages because Sun failed to allege and prove a separate tort distinct from the breach of contract. In its eighteenth point of error, C & C maintains that the trial court erred in entering judgment for fraudulent misrepresentation because there was no evidence or insufficient evidence to support the jury's finding of such fraud.

Among the essential elements of actionable fraud is a showing of injury suffered because of the fraud. *Stone v. Lawyers Title Ins. Co.*, 554 S.W.2d 183, 185 (Tex.1977); *Oilwell Div., United States Steel Corp. v. Fryer*, 493 S.W.2d 487, 491 (Tex.1973). The absence of this element will prevent recovery for fraud. *Fryer*, 493 S.W.2d at 491. Generally, fraud which forms the basis of a plaintiff's case must be the cause of a claimed loss. There must be pleading and proof of a pecuniary loss suffered which is directly traceable to and which resulted from the

false representation upon which the injured party relied. *Mumphord v. First Victoria Nat'l Bank,* 605 S.W.2d 701, 704 (Tex.Civ. App.—Corpus Christi 1980, no writ). The measure of damages in fraud cases is the actual amount of the complaining party's loss resulting directly and proximately from the fraud practiced upon him. The desired end is actual compensation for the injury, not lost profits. *Morriss–Buick Co. v. Pondrom,* 131 Tex. 98, 101, 113 S.W.2d 889, 890 (Tex.Comm'n App.1938, opinion adopted); *Duval County Ranch Co. v. Wooldridge,* 674 S.W.2d 332, 335–36 (Tex. App.—Austin 1984, no writ). Speculative losses and lost profits are not recoverable in an action for fraud. *Hudson & Hudson Realtors v. Savage,* 545 S.W.2d 863, 868 (Tex.Civ.App.—Tyler 1976, no writ).

▬ In its second amended petition, Sun alleged that Caldwell fraudulently promised Sun that C & C would pay its share of the expenses of all well operations and that:

> Sun relied on defendants' promises and representations by incurring and paying expenses on behalf of defendants for the drilling and completion operations performed on these wells. Therefore, Sun has suffered a detriment in the approximate amount of $3,168,032.25, and Sun is entitled to reimbursement for those costs paid on behalf of defendants. Sun seeks to recover those costs in this lawsuit.

Sun also claimed that Caldwell fraudulently represented that he had consented to the well operations and that Sun relied to its detriment on those material representations "by incurring and paying for these expenses on behalf of defendants." Sun again alleged that it had been damaged in the approximate amount of $3,168,032.25 due to these misrepresentations regarding consent. The amount claimed as damages for fraud is identical to the amount claimed as damages for C & C's breach of contract. We have examined the entire appellate record in accordance with the evidentiary standards of review discussed previously, and we have searched in vain for proof of the loss suffered by Sun as a direct and proximate result of C & C's alleged fraudu-

lent misrepresentations. Absent proof of such injury, there can be no recovery for fraud. Our examination of the record reveals that, although there was arguably some proof of some of the essential elements of fraud, there was no evidence of injury proximately resulting from the alleged fraud apart from the damages suffered as a result of C & C's breach of contract.

Sun argues that it paid 100 percent of the costs of drilling and completing the wells at issue and that it billed C & C for reimbursement of C & C's unpaid share of those costs. According to Sun, C & C's unpaid share of the costs constitutes the damages for breach of contract. Sun then notes that its accountant testified that Sun incurred additional expenses as operator for such things as building maintenance, costs of computers, costs of materials, and inventory warehouse charges. Sun contends that the jury reasonably inferred that Sun had incurred these additional damages beyond those damages attributable to the breach of contract. However, the record shows that Sun's accountant stated that those costs, which he characterized as administrative or overhead costs, are charged as overhead costs or charges and negotiated at the time the agreements are drawn up. Thus, it appears from the record that the joint account of the operator and nonoperator was charged for those costs, and C & C would have been billed for its proportionate share of such costs. In our view, the accountant's testimony in this regard did not constitute evidence of Sun's damages that proximately and directly resulted from C & C's alleged fraud apart from the damages suffered as a result of C & C's breach of contract.

▬ Punitive damages are not recoverable for breach of contract. On the other hand, punitive damages are recoverable if a distinct and independent tort with accompanying actual damages has been established. *Texas Nat'l Bank v. Karnes,* 717 S.W.2d 901, 903 (Tex.1986) (per curiam); *Bellefonte Underwriters Ins. Co. v. Brown,* 704 S.W.2d 742, 745 (Tex.1986); *see City Prods. Corp. v. Berman,* 610 S.W.2d 446, 450

(Tex.1980). It is not necessary that the tort and the breach of contract arise out of separate and distinct transactions, but both the tort and the breach of contract must be separately pleaded and proved. *Texas Power and Light Co. v. Barnhill*, 639 S.W.2d 331, 334 (Tex.App.—Texarkana 1982, writ ref'd n.r.e.).

■ Because Sun failed to prove the essential element of actual damages resulting directly and proximately from C & C's alleged fraudulent misrepresentation, we conclude that the trial court erred in rendering judgment for both breach of contract and fraud. Moreover, since Sun failed to prove a separate and distinct tort apart from the breach of contract, punitive damages were not recoverable, and the trial court erred in awarding such damages. We therefore sustain C & C's points of error fourteen, fifteen, and eighteen. Because of our disposition of these three points of error, we determine that we need not consider C & C's points of error sixteen, seventeen, twenty-two, and twenty-three, which also concern the award of punitive damages.

## PREJUDGMENT INTEREST

C & C contends in its nineteenth point of error that the trial court erred in rendering judgment against C & C for prejudgment interest under the joint operating agreements because there was no evidence or insufficient evidence from which such interest could be calculated as provided in the agreements. In pertinent part, the contracts provide that "[e]ach Non–Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid' balance shall bear interest monthly at the rate of eighteen percent (18%) per annum."

■ C & C initially argues that the evidence did not show that it received written invoices as required by the joint operating agreements. We are again required to examine the record in accordance with the evidentiary standards of review set forth previously. Sun's accountant testified that monthly billings were sent to C & C on a monthly basis, covering all wells in which C & C was participating. Caldwell admitted that he received invoices covering the wells at issue in this case and that those invoices were not paid. We conclude that the above testimony is both legally and factually sufficient to support a finding that the required invoices were received by C & C.

C & C also argues that Sun failed to establish when the invoices were received. C & C contends that this failure was fatal to Sun's claim for prejudgment interest since the contracts specified that such interest did not begin to accrue until fifteen days after receipt of the invoices. Sun, relying on *Perry Roofing Co. v. Olcott*, 744 S.W.2d 929, 930 (Tex.1988), argues that prejudgment interest should be allowed if the contract provides the conditions upon which liability depends and fixes a measure by which the sum payable can be ascertained with reasonable certainty. Sun's reliance upon *Perry Roofing* is misplaced. First of all, the supreme court's statement relied on by Sun is made in the context of its discussion of *statutory* prejudgment interest authorized by article 5069–1.03 of the Texas Revised Civil Statutes. Second, the supreme court's statement refers to the sum payable under a contract or account. *Perry Roofing*, 744 S.W.2d at 930; Tex. Rev.Civ.Stat.Ann. art. 5069–1.03 (Vernon 1987). Thus, the supreme court was discussing the necessity that the principal amount of liability upon which statutory prejudgment interest is to be calculated must be reasonably certain. However, C & C's complaint about the prejudgment interest awarded concerns the certainty of the calculation of the prejudgment interest itself; it is not directed at the certainty (or lack therof) of the amount of the principal liability upon which prejudgment interest is to be calculated. In other words, C & C is not asserting that the amount upon which prejudgment interest was calculated was uncertain. Instead, it argues that the dates from which prejudgment interest under the contracts began accruing were not established, thereby rendering fatally uncertain the necessary calculation of prejudgment interest in accordance with the

contractual provisions on prejudgment interest.

An injured party should be made whole, and a plaintiff should be compensated when the defendant has had the beneficial use of damage funds between the time of the injury and the date of the judgment. Prejudgment interest serves this purpose by compensating the plaintiff for being denied the opportunity to invest the amount of the damages and earn interest on it. *Matthews v. DeSoto*, 721 S.W.2d 286, 287 (Tex.1986). It is well established law in Texas that prejudgment interest is recoverable as a matter of right when an ascertainable sum of money is determined to have been due and payable at a certain or definite date prior to judgment. *Miner–Dederick Constr. Corp. v. Mid–County Rental Serv., Inc.*, 603 S.W.2d 193, 200 (Tex.1980); *Republic Nat'l Bank v. Northwest Nat'l Bank*, 578 S.W.2d 109, 116 (Tex. 1979) (op. on reh'g); *Black Lake Pipe Line Co. v. Union Constr. Co.*, 538 S.W.2d 80, 95–96 (Tex.1976), *overruled on other grounds, Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989). Prejudgment interest is calculated on the sum payable to the plaintiff from the time of his loss or injury to the time of the judgment. *Republic Nat'l Bank*, 578 S.W.2d at 116; *Black Lake*, 538 S.W.2d at 95–96. Thus, the date of the plaintiff's loss must be reasonably certain for the simple reason that the prejudgment interest on that loss runs from the date of the loss.

Under the contractual terms providing for prejudgment interest, the dates of the losses are clearly specified as fifteen days from the date the various invoices were received. We have examined the record in this case applying the appropriate standards of evidentiary review. The joint operating agreements provide that "Operator shall bill Non–Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month." We conclude that this contractual provision for end of month billings, together with the evidence that the invoices were in fact sent and received, constitutes some evidence upon which a fact finder could base a finding fixing the dates of the losses, but we have found no other evidence tending to establish these dates. In our view, something more in the way of evidence was required for a factually sufficient finding regarding when the invoices were received by C & C. We therefore hold that the evidence is factually insufficient to support a finding of reasonable certainty as to when Sun's losses were sustained under the contractual provisions on prejudgment interest.

Because the dates of the losses were not established with the required certainty, the trial court erred in awarding prejudgment interest under the contracts. We therefore sustain C & C's nineteenth point of error.

## PROPER PARTIES

In points of error twenty-one and twenty-two, C & C contends that the trial court erred in granting judgment against a number of C & C entities collectively referred to as the tax partnerships. C & C argues that the evidence conclusively established as a matter of law that the only entity with whom Sun contracted was C & C Partners. C & C also maintains that there was no evidence or insufficient evidence that any of the tax partnerships were parties to any of the agreements. Sun contends that these alleged errors were waived because C & C failed to raise them by means of a verified denial under rule 93 of the Texas Rules of Civil Procedure. *See* TEX.R.CIV.P. 93.

Privity is an essential element necessary to any recovery in an action based on contract. *Major Invs., Inc. v. De Castillo*, 673 S.W.2d 276, 279 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.); *Republic Nat'l Bank v. National Bankers Life Ins. Co.*, 427 S.W.2d 76, 79 (Tex.Civ. App.—Dallas 1968, writ ref'd n.r.e.). Thus, maintenance of an action for breach of contract generally requires privity between the party damaged and the party sought to be held liable. *Republic Nat'l*, 427 S.W.2d at 79. The plaintiff has the burden of proving that the defendant has obligated himself under the contract, and it therefore follows that the defendant's denial of this

element does not constitute an affirmative defense. *See Miles v. Plumbing Services of Houston, Inc.,* 668 S.W.2d 509, 512 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). In the absence of purported execution of the contract by or on behalf of a defendant, we conclude that a defendant sued for breach of contract does not have to allege in a verified pleading that he is not a party to the contract. *See* Tex.R. Civ.P. 93(7) (denial of execution of a written instrument must be verified); *John Chezik Buick Co. v. Friendly Chevrolet Co.,* 749 S.W.2d 591, 593 (Tex.App.—Dallas 1988, writ denied) (litigant does not have to allege that he is not a party to a contract under rule 93(2) requiring a verified denial that a defendant is not liable in the capacity in which he is sued).

■ The agreements involved in this case are signed by Caldwell on behalf of C & C Partners. Since the contracts do not indicate that they were executed by or on behalf of the C & C tax partnerships, C & C did not waive the alleged error that it raises on appeal by failing to raise it by a verified denial.

■ Therefore, we review the record in accordance with the applicable standards of evidentiary review to determine whether Sun met its burden of establishing privity between itself and the tax partnerships. At trial, the following exchange with Caldwell took place:

Q All right. Now, C & C Partners is one of the parties in the lawsuit?

A Yes, sir.

Q All right. Now, there are some limited partnerships that are also parties in the lawsuit—correct?

A Yes, sir.

Q Would you tell the jury how those limited partnerships fit into the scheme of things?

A Well, we formed C & C Partners. We—in 1982 or sometime. We had a drilling program with a group of people.

The next year, 1983, we formed another partnership after Sun had offered us some prospects to drill on. We formed C & C—what we call 1983—because most of the people had—or many of the people had invested with us before, and to keep from getting confused we formed C & C in 1983. So we—we would have a means of identifying what program we were talking about. We formed 1983 Drilling Fund A, B, C, D, and E, and I don't—one of them wasn't activated. I think it was—

Q C.

A—C, to the best of my memory.

Q All right. Now, on any of these investments, let's talk about the East Wilson Prospect for a moment.

East Wilson Prospect was signed by C & C Partners. So, who was involved in the East Wilson Prospect; would it be all of the limited partners, or just some of them?

A C & C Partners would be the General Managing Partner, and all of the other partnerships, other than C, would be involved. Yes, sir.

Q And would that be the case for the South Alamo, and the Atlee Prospect also?

A Yes, sir.

Q All right. So, maybe we can generalize then. For every prospect we're going to be talking about in this case, C & C Partners was the General Managing Partner and each of these limited partnerships were the limited partners involved in that prospect?

A Yes, sir.

"Privity" is defined as a mutual or successive relationship to the same rights of property. *City of Dallas v. Brown,* 150 S.W.2d 129, 131 (Tex.Civ.App.—Dallas 1941, writ dism'd). We determine that the quoted testimony is some evidence that the C & C tax partnerships were in contractual privity with Sun. In addition to the testimony quoted above, the record contains letters from Caldwell to members of the various C & C tax partnerships soliciting financial participation in various operations concerning the wells involved in this case. In our view, the evidence indicates that the tax partnerships did participate in the joint operations in the anticipation of benefitting from such participation. Moreover, we

find no evidence to the contrary other than the fact that Caldwell signed the agreements only on behalf of C & C Partners (although we note that there is no evidence as to whether "C & C Partners" was or was not meant to include the tax partnerships). We cannot conclude that a finding of privity as to the tax partnerships was so against the overwhelming weight of the evidence as to be clearly wrong and unjust. Our reading of the record shows that the tax partnerships were in a mutual relationship with the other parties with respect to the rights and liabilities under the agreements. *See Brown*, 150 S.W.2d at 131.

■ We must now consider a separate complaint regarding the proper parties to this lawsuit. Prior to submission, this Court granted permission to a California attorney to appear on this appeal, *pro hac vice*, as an attorney of record for C & C Partners, a California limited partnership, and its predecessor, C & C Partners, a California general partnership. To avoid confusion, we will refer to these particular appellants collectively as C & C–California and, separately, as C & C–Limited or C & C–General. In its first point of error in its separate brief, C & C–California adopts by reference the points of error numbered one through fourteen and seventeen which have been previously discussed. In view of the fact that we have already considered and resolved those points of error, we find it unnecessary to repeat ourselves here, and we simply adopt our previous dispositions of those points of error.

In points two, three, and five, C & C–California contends that the trial court erred in entering judgment against C & C Partners to the extent that the judgment purports to be entered against C & C–Limited. In its fourth point of error, C & C–California argues that the trial court erred in entering judgment against C & C Partners because the judgment is ambiguous. C & C–California notes that Sun filed suit against Caldwell, William E. Campbell, Campbell Company, Ltd., the 1983 C & C tax partnerships, and C & C Partners, "a California general or limited partnership." The crux of C & C–California's argument is based on the fact that the trial court's judgment does not designate which entity, C & C–Limited and/or C & C–General, is obligated under the judgment against "C & C Partners." C & C–California contends that the record establishes that C & C–General was the entity involved in the transactions which are the subject of this litigation. In this regard, there was testimony that C & C Partners was a general partnership. C & C–California further argues that the record establishes, through silence, that C & C–Limited was not involved in the transactions at issue in this case. Therefore, C & C–Limited states that it has appeared in this case in order to ensure that "its separate interests are not mistakenly encumbered by the results of litigation between the other named Defendants and Sun." C & C–California asks us to reverse the judgment insofar as it includes C & C–Limited.

Courts cannot decide cases based on what may happen in the future; cases must be decided upon present conditions as demonstrated by the facts in a particular case. *Town of Refugio v. Strauch*, 29 S.W.2d 1041, 1044 (Tex.Comm'n App.1930, judgm't adopted). Courts may not render advisory opinions upon controversies which may arise but which do not presently exist. Claims based merely upon assumed potential invasions of rights are not sufficient to warrant judicial intervention. *Puretex Lemon Juice, Inc. v. California Products, Inc.*, 324 S.W.2d 449, 452 (Tex.Civ.App.—San Antonio 1959), *aff'd*, 160 Tex. 586, 334 S.W.2d 780 (1960). Our judicial system rests upon the foundation of adversary presentation which affords the theoretical guarantee that diligent antagonists, by developing all aspects of the dispute, will prevent a court from being misled by inadequate understanding of the facts and law and adopting a position unjust to the parties and possibly damaging to the community. *Fikes v. Ports*, 373 S.W.2d 806, 808 (Tex.Civ.App.—Fort Worth 1963, writ ref'd n.r.e.).

C & C–California has presented to this Court a purported controversy which is raised for the first time on appeal. There has been no presentation of the alleged

dispute in an adversarial manner in a trial court. There has been no contest as to the facts and circumstances surrounding the issues. There is no allegation that Sun has attempted to enforce its judgment against anyone or any entity. We do not have the benefit of any California law that might be applicable to resolution of the professed controversy. For example, we have not been referred to any California law concerning the dissolution and creation of partnerships and the effects of such dissolution and creation on prior partnership obligations.

In our view, the matters raised in C & C–California's points two through five are not matters that should be resolved by an appellate court without the benefit of a prior adversary contest in a trial court. C & C–California has improperly asked us to decide a dispute which may or may not arise, and it has requested us to do so without there having been any kind of trial on the merits of the purported dispute in a court possessing the authority to initially resolve any material questions of fact and law. We therefore overrule C & C–California's points of error two through five.

### DISPOSITION

Having sustained a "no evidence" point regarding the award of actual damages and punitive damages for fraudulent misrepresentation, we reverse the trial court's judgment awarding such damages and render a take nothing judgment on Sun's claim of fraudulent misrepresentation. *See National Life and Accident Ins. Co. v. Blagg,* 438 S.W.2d 905, 909 (Tex.1969); TEX.R. APP.P. 81(c). Because we have sustained a "factual insufficiency" point concerning the award of prejudgment interest, we reverse the trial court's judgment awarding such interest and remand this case for further proceedings on prejudgment interest. *See Wright Way Spraying Serv. v. Butler,* 690 S.W.2d 897, 898 (Tex.1985); TEX.R. APP.P. 81(c). In all other respects, we affirm the judgment of the trial court.