**OILWELL DIVISION, UNITED STATES STEEL CORPORATION, Petitioner,**

v.

**R. J. FRYER, Respondent.**

No. B–3087.

Supreme Court of Texas.

Jan. 10, 1973.

Strasburger, Price, Kelton, Martin & Unis, Royal H. Brin, Jr., Dallas, for petitioner.

Griffith & Lumpkins, Lynn B. Griffith, Waxahachie, for respondent.

GREENHILL, Chief Justice.

The defendant, Fryer & Willis Drilling Company, a corporation, purchased two oil well drilling rigs, equipment therefor, and other supplies from the Oilwell Division of United States Steel Corporation, hereinafter referred to as USS. The codefendant, R. J. Fryer, signed a written guaranty which, on its face, is an unlimited personal guaranty for the payment of the debts of Fryer & Willis Drilling Company. The latter corporation defaulted in its payments. A judgment was entered against it, and nothing is before us as to the corporation. Our opinion will deal only with the liability of Fryer.

As the case reaches us, this is a suit on the unlimited guaranty of R. J. Fryer. He concedes that he guaranteed the payment for the first drilling rig up to $100,000.00. He denies personal liability as to the bal-

ance. He admits signing the guaranty and agrees that, on its face, the guaranty is unlimited. He pleads the affirmative defense of fraud.

Trial was to a jury which answered some of Fryer's special issues as to fraud by USS in the negative. The trial court entered judgment on the jury's verdict for the plaintiff USS. The court of civil appeals affirmed the judgment against Fryer for the price of the first rig, but it reversed the judgment of the trial court as to Fryer's personal liability on the guaranty for purchases of the corporation on open account and for the second oil rig purchased by the corporation. That court rendered judgment that Fryer was liable only for the price of the first rig. 472 S. W.2d 857. The court of civil appeals held against Fryer on his other points dealing with the foreclosure sale of the oil rigs. Those points were not brought to this court. What is before us is the holding of the court of civil appeals that "without need of reference to the statement of facts," USS was guilty of fraud and that the finding of the jury that the representations of the agent of USS was not made *for the purpose of inducing Fryer to sign the guaranty* was immaterial. We are of the opinion that the intermediate court was in error as to such holding. Accordingly, we reverse its judgment and affirm the judgment of the trial court.

Since the court of civil appeals was of the view that the record showed that the representations of the agent of USS were false "without need of reference to the statement of facts," it is necessary to set out in detail some of the testimony, including evidence which would support the jury's answer to the issue which found, in effect, that the representations of the agent of USS were not made for the purpose of inducing Fryer to sign the guaranty.

Mr. Fryer had been in the oil well drilling business for many years. His operations had been in various parts of the United States. He had dealt with USS and its agent, L. L. Mitchell since at least 1944. Fryer had formed at least two drilling corporations. In 1947, Fryer desired to purchase equipment from USS. He formed a Delaware corporation named Standard-Fryer Drilling Company to have its home office in Illinois. In connection with the purchase from USS of oil well equipment by that corporation, Fryer signed a letter to USS which, among other things, provided that USS could extend credit to Standard-Fryer Drilling Company, "and my liability in this connection is unlimited, for which this shall be a continuing guaranty." At this trial, Fryer at first denied that he had ever given any unlimited guaranty. When shown the above guaranty, he said that he had forgotten about it. In connection with the present guaranty, he said he did not know what an unlimited guaranty was when he gave the guaranty with a blank dollar amount in it.

As to the present guaranty, Fryer testified that the Fryer & Willis Drilling Company was to be formed, and was formed, to do some drilling in the Ohio area. Fryer (the corporation) needed to buy a drilling rig and supplies, and there was a need to purchase them mainly on credit. Fryer picked out the rig he wanted in Oklahoma City, and the negotiations for its purchase from USS occurred in Fryer's office in Dallas.

At the time of such negotiations and when the guaranty was signed, the Fryer & Willis Drilling Company had not been formed. It was to be a West Virginia corporation and was to have a total capital stock of $10,000. This first rig and equipment cost in the neighborhood of $108,000. It was proposed that the corporation's entire $10,000 would be used as a down payment (which it was), and the balance would be for credit. Except for the $10,000, the corporation had no other established credit.

The testimony, most of which was introduced without objection, is conflicting as

to what was said when the guaranty was executed by Fryer. Only a few people were present in Fryer's office. They included Fryer and his sister, Mrs. Willis, who was secretary for the corporation and Fryer's personal secretary. Also present were agents of USS, L. L. Mitchell and Jack Slaughter.

The written guaranty provided in part that in consideration of credit given by USS to Fryer & Willis Drilling Company, Fryer unconditionally guaranteed to USS the payment of all debts which the corporation might owe USS. It provided,

"This guaranty shall be revolving and continuous to the extent of $————, plus interest, costs, and expenses, all as hereinafter provided, *and in the event the amount of the liability is not limited in the space provided, then this guaranty shall be unlimited.*" [Emphasis ours.]

The guaranty also provided,

"It is hereby warranted and represented that this guaranty has not been executed upon any statement or representation not contained herein, and that this guaranty embodies all the understandings between USS and the undersigned as to its subject matter and shall not be modified except with the approval in writing signed by an authorized executive officer of USS."

L. L. Mitchell, treasurer of the Oilwell Division of USS, testified that Fryer approached him to buy a rig and supplies mainly on credit. Mitchell testified to his previous experience with Fryer and the previous corporation, the Standard-Fryer Drilling Company. Mitchell said that under no circumstances would he have sold the equipment to a newly formed corporation with only a $10,000 capital without Fryer's personal guaranty, and that he did not represent to Fryer that his guaranty would be limited.

Jack Slaughter, the credit manager for the Oilwell Division of USS, gave testimony that supported that of Mitchell: that Fryer was not told that the guaranty signed was temporary or limited to the purchase of the first rig. Slaughter received the check of Fryer & Willis Drilling Company for $10,000 upon the purchase of the first rig.

At the time of the negotiations in Fryer's Dallas office, the total cost for the drilling rig, its equipment and supplies, was *not fully known.* The guaranty was signed on May 6. Thereafter the corporation's $10,000 was paid in cash. In June, the Fryer & Willis Drilling Company executed its promissory note for $98,493.00 to USS for the balance on the first rig and its equipment. A security agreement (chattel mortgage) was executed at about the same time. In October, a second rig was desired. USS had an auction sale, and a second rig was purchased by Fryer & Willis on credit from USS. For this, Fryer & Willis Drilling Company gave its note to USS for $80,341.00, and an additional security agreement was executed.

Fryer testified that 11 or 12 wells were drilled with the first rig and 4 or 5 wells were drilled with the second rig when, some five or six months after the purchase of the second rig, the Fryer & Willis Drilling Company "was broke."

Fryer testified that when the parties met in his office and the guaranty agreement was signed, as stated above the exact dollar amount of the purchase of the first rig was not known. That is conceded by USS. Fryer says that this explains why the dollar amount was not filled in. Fryer said he objected to signing the guaranty until the dollar amount was filled in, but he said Mitchell (the agent of USS) told him that it could not be filled in until the cost of the rig then being purchased was known. Fryer said he told Mitchell that he did not want his personal guaranty to exceed the price of the first rig or to exceed $100,000. He said that Mitchell told him the guaranty signed was just temporary and would be replaced by another one; that this was just a "temporary deal" to satisfy some

Oklahoma law. Fryer said he was told by Mitchell that the law required his guaranty to move the rig out of Oklahoma. Witnesses of USS later testified that under the new Uniform Commercial Code, it was the furnishing of a financial statement and the security agreement which was necessary to move the equipment out of the state, and that they so explained to Fryer.

Fryer testified that the amount of his guaranty was not to exceed $100,000 and that this was all right with Mr. Mitchell. Fryer explained that he was in a hurry to catch a plane and did not read the entire guaranty agreement. He testified that he told Mitchell that his guaranty was restricted to rig number one and that Mitchell so agreed; that he, Fryer, relied on Mitchell's statement; that all they were talking about *at that time* was rig number one; that "it was supposed to be a temporary agreement . . . to get the rig out of the State of Oklahoma into another state and was supposed to be replaced later with another one"; that Mitchell told him that.

Regarding the signing of the guaranty with the dollar amount blank, Fryer testified on cross-examination:

"Q   Are you saying Mr. Mitchell tricked you?

A   No—I don't know what he done. I'm not accusing him—

Q   You've dealt with him over 25 years.

A   Maybe he did trick me; I don't know.

Q   Are you trying to say that Mitchell . . . was down here trying to trick you, an experienced business man?

A   I'm not. I don't know about that."

Mrs. Willis, Fryer's sister, substantiated Fryer's testimony that the guaranty was just a temporary paper and that Fryer wanted his guaranty limited to $100,000.

On cross-examination, she could not explain why, if it was understood that Fryer's liability was to be limited to $100,000, that figure was not put in the blank.

As we understand the briefs, the jury issues as to fraud were submitted by counsel for Fryer. There was no objection to them. Reduced to their relevant words, the issues and answers were:

1. Do you find that at the time Fryer signed the guaranty agreement, Mitchell, the treasurer of the plaintiff [USS] represented as a fact to Fryer that such guaranty agreement covered only the purchase cost of drilling rig No. 1 and its equipment?

Answer: Yes.

2. Do you find that such representation was false?

Answer: No.

3. Do you find that such representation was made for the purpose of inducing Fryer to sign the guaranty agreement?

Answer: No.

In answers to issues 4 and 5, the jury found that Fryer relied upon Mitchell's representation; and but for such, he would not have signed the guaranty.

■   The defense of Fryer to the guaranty agreement was fraud. Fraud is an affirmative defense under Rule 94, Texas Rules of Civil Procedure. Unless fraud is established as a matter of law, which we do not find to be the case, the burden is upon Fryer to obtain jury findings to establish the necessary elements of his affirmative defense. Reed v. Buck, 370 S. W.2d 867 at 874 (Tex.1963). This Fryer failed to do. While generally speaking, to establish fraud there must be a finding of a *false* representation (which we do not have here under the jury's findings), our opinion need be based, as it is based, only on the negative answer to special issue number 3 where the jury answered "no" to

the question, "Do you find that the representation was made for the purpose of inducing Fryer to sign the guaranty agreement?" That is not an immaterial finding but is one of the necessary elements of fraud as set out in Wilson v. Jones, 45 S. W.2d 572 (Tex.Com.App.1932). That opinion states at page 573:

> "The authorities announce the general rule that to constitute actionable fraud it must appear: (1) That a material representation was made; (2) that it was false; (3) that, when the speaker made it, he knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) *that he made it with the intention that it should be acted upon by the party*; (5) that the party acted in reliance upon it; and (6) that he thereby suffered injury. . . . Each of these elements must be established, . . . and the absence of any one of them will prevent a recovery."

■ The cases cited by Fryer in support of the holding of the court of civil appeals are those dealing with *an intent to deceive* which is not the same thing as a representation made *for the purpose of inducing another to act*. The failure of the jury to find that the representation was made for the purpose of inducing Fryer to sign the guaranty is fatal to Fryer's defense of fraud. No attack is made on the issue, and there was no motion to disregard it. There was no point below that the evidence was insufficient to support the answer; and from the evidence set out above, we find that there is evidence to support the answer. We add that there is no contention that the guaranty was executed by mutual mistake, and there was no prayer for reformation. No question relating to the parol evidence rule is raised, and a discussion thereof is unnecessary. The judgment of the trial court, therefore, was a correct one.

The judgment of the court of civil appeals is reversed, and the judgment of the trial court is affirmed.