John **KLEKAR**, Individually and as Next Friend of Tina Klekar, Deceased and Amber Klekar, Deceased and Doris Wilkins and James L. Rix, Appellants,

v.

**SOUTHERN PACIFIC TRANSPORTATION CO.** and Asplundh Railroad Division, Appellees.

No. 01–90–00909–CV.

Court of Appeals of Texas, Houston (1st Dist.).

April 7, 1994.

Stanley J. Krist, Houston, for Klekar.

Joe B. Stephens, R. Gary Stephens and R. Andrew Black, Houston, for James Rix and Doris Marilyn Wilkins.

Mainess Gibson and Deborah A. Newman, Houston, for Southern Pacific Transp.

James E. Mcnerney, Donald W. Towe and Michaela L. Clarke, Houston, for Asplundh R.R. Div.

Before DUGGAN, WILSON and MIRABAL, JJ.

## OPINION

WILSON, Justice.

On September 11, 1987, Tina Klekar and her 17–month old daughter, Amber, were tragically killed in a car-train collision at the Engle crossing near Schulenburg, Texas. John Klekar, the husband of Tina and father of Amber, with Doris Wilkins and James L. Rix, parents and grandparents, jointly brought this lawsuit against Southern Pacific Transportation Company (Southern Pacific), and Asplundh Railroad Division (collectively, the appellees). John Klekar, Wilkins, and Rix (collectively, the appellants), claimed in the trial court that the appellees' negligence caused the wrongful death of Tina and Amber.

The appellees denied any negligence on their part and affirmatively asserted Tina Klekar's negligence was the cause of the accident. The appellees also pled John Klekar had signed a release and had accepted $25,000 in full settlement of any claims. John Klekar specifically alleged he signed the release of claim in favor of the appellees [1] because of the fraud of a Southern Pacific employee.

Following a trial of over two weeks, a jury found only Tina negligent, and failed to find Southern Pacific and Asplundh Railroad Division (Asplundh) negligent to any degree. Southern Pacific operated the train and Asplundh was responsible for clearing vegeta-

---

1. It is disputed by appellants whether Asplundh is a party to the release.

tion at the crossing. The jury also failed to find the crossing itself was "extra hazardous." After post-trial proceedings, the court rendered a take nothing judgment in favor of appellees.

The appellants raise seven points of error. However, they primarily complain their case was prejudiced by the testimony of a Department of Public Safety officer who was permitted to testify before the jury as an expert, despite the appellees' failure to designate him as a witness in any capacity. We affirm.

## FACTUAL BACKGROUND: CAR–TRAIN COLLISION

The railroad crossing where the accident occurred was on Fayette County Road 331 near U.S. highway 90 close to Schulenburg, Texas. Tina was traveling south on 331 at about 3:00 p.m. when she crossed the track at the same time as a Southern Pacific train passed heading west at an approximate speed of 65 miles per hour. The collision pushed the Klekar auto nearly 100 feet down the tracks, flipping it several times.

Norris Sternadel testified that at about 2:00 p.m. on the date of the accident, he left the pasture he leased where he had been checking his cattle. Sternadel traveled west down a gravel road, made a right turn, headed north on 331, and crossed the railroad tracks. To this point, Sternadel said he heard no train whistle. After he crossed the tracks and continued moving north toward U.S. highway 90, a car, driven by Tina Klekar, turned in front of him and passed beside him, heading south toward the railroad track. He estimated her speed at 10 miles per hour or less. Then he said the whistle blew. He looked back over his shoulder to see where the car was, and it had been hit. He estimated there was maybe a second between the time he heard the whistle blow and the time he heard the bang of the collision.

Sternadel stated it was necessary to get up to within 10 feet of the track before you could see a train coming. He further said that he probably had his radio on in his truck that day.

Other testimony indicated Sternadel gave a statement to a Southern Pacific claims representative, Sonia Elveston, four days after the accident, at which time he stated that he was "parked" at a stop sign on county road 331. This differs from his account at trial in which he said he was coming over the track when Tina turned off Highway 90, onto 331, and then drove beside and past him heading south toward the crossing. In his statement to Elveston and at trial, Sternadel agreed with Elveston's statement that the grass, that she had measured on the northeast side of the track to be four and one-half feet, on the average, could not have entirely blocked the view of the engine that was 14½ feet high.

Eugene Pavlicek was on the other (north) side of Highway 90, on F.M. 2238, facing south and waiting at a stop sign. He saw Tina come from the west and turn south toward the track. Pavlicek testified his thoughts at that time were, "I hope she sees the train." Pavlicek stated that "at the last point," the train blew the whistle and Tina slammed on the brakes. He saw Tina raise up in the car, and then the collision occurred. In his deposition testimony, Pavlicek stated that the train blew its whistle for 30 seconds before impact. During the trial, he changed his testimony to one second. Pavlicek said he worked for plaintiff's counsel, Mr. Krist, and stated that Mr. Krist "always helps me out and everything, you know."

Joyce Patterson, a claims representative for Southern Pacific, took a recorded statement from Mrs. Angelina Schwenke who had been drinking in Chudje's Bar from before the accident until the interview at 6:15 p.m. At that time, and during her deposition, she stated that she heard the train whistle and the noise of the collision at the same time and then saw a flying object. In a handwritten statement executed May 7, 1990, and taken by Deborah A. Newman, an attorney for Southern Pacific, Schwenke said she heard the whistle 10 seconds before impact.

Jimmie Dale O'Brien, the train's engineer, testified that Tina never looked his way and

looked straight ahead the whole time. Robert Wayne Seaman, the fireman, testified that, at the time of impact, Tina was looking straight ahead.

Three of the five members of the train crew, O'Brien, Seaman, and conductor Norman Robert Sutton, who were sitting in the front engine, all testified O'Brien sounded the whistle at or before the whistle board, and continued to sound the whistle through the crossing. The whistle board is located one-quarter mile before the crossing and is intended to alert the crew to begin sounding the crossing warning devices, a whistle, and a bell. In the statement O'Brien gave the Southern Pacific investigator the day of the accident, he stated the bell was an automatic one that sounds when you blow the whistle. Brakeman Eugene Lange and Joe Mesa said they could not hear the whistle because of the configuration of the engines, the noise of the air conditioner, the electronic equipment, and the fact they were at the rear of the train.

John Laughlin, a Texas Highway Department employee who visited the crossing a few days after the accident, stated that the view of the track leaving Highway 90 traveling in a southerly direction toward the crossing was unobstructed. Laughlin, currently a railroad signals consultant, and formerly a Southern Pacific employee who retired in 1984, had responsibility for the maintenance of crossings including the Enlge crossing for the last 10 or 15 years of his career at Southern Pacific. He further stated he looked at the photographs taken of the crossing at the time of the accident and performed on the ground inspections. He formed the opinion that the visibility at the time of the accident was satisfactory and a person driving a car approaching the track could have seen a train before they got on the track.

Charles R. Ruble, an accident reconstruction expert, testified that based upon a scientific analysis of the filament of the brake lights of Tina's car, she did not apply the brakes until two-and-a-half to three seconds before the collision.

## FACTUAL BACKGROUND: RELEASE

Roy L. Henley, Jr. testified he was then (at the time of the trial) employed by an investigation agency owned by the brother of one of the attorneys in the firm representing the appellants. In addition, the investigation firm leased space from one of the appellants' attorneys. Henley testified that at the time of the accident, he was district claims agent for Southern Pacific. Six months after the accident, he left Southern Pacific because it offered him the choice of accepting a transfer and demotion or resigning.

Henley testified that six days after the accident, he met with John Klekar to attempt to settle the case. He testified he fabricated a story, telling Klekar he had not found anything to date the railroad had done wrong and that it was apparent Tina had been hit because she did not look in the direction of the train. He also said he lied to Klekar when he told him that a test had been performed on the brake light filaments of her car that showed she had not applied the brakes before the crash.

Henley stated that while Klekar sat there in a glazed stare, his assistant, Elveston, filled out the release and the draft. Still in the glazed stare, Klekar looked briefly, less than two minutes, at the form. He corrected the spelling of his name on the release, signed the release, and accepted the check for $25,000.

On direct examination, Klekar testified he just started to read a few words off the release, but it did not make any sense. On cross-examination, Klekar testified that in his earlier deposition, he said he did read the release. He cashed the check at the bank the next day, putting $8,000 in a CD and the rest in another account.

The release itself shows two initialled corrections of John Klekar's name, apparently done by Klekar, one toward the top of the document and one toward the bottom. Above the signature lines, in all caps and bold letters is the sentence, "I (WE) HAVE CAREFULLY READ THIS FINAL RE-

LEASE OF ALL CLAIMS AND FULLY UNDERSTAND IT." It is signed by Klekar individually and as representative of the estates of Tina Klekar and Amber Klekar. In return for $25,000, the document releases all of Klekar's and the estates' causes of action against Southern Pacific, "and all its officers, agents, employees, surgeons, physicians and any other parties or parties or institutions in any way connected with its service or affairs." The release does not mention by name the Asplundh Railroad Division. Neither does it mention the causes of action of Tina's mother and father, Doris Wilkins and James L. Rix.

Dr. Fred Fason, a neuropsychiatrist, first examined Klekar two years and three months after the accident at the suggestion of appellant's counsel. He testified that in his opinion, Klekar did not have the full capabilities to understand the release and the significance of the act of settling with the railroad by signing the release.

## TESTIMONY OF OFFICER M.D. WYATT

The appellants' counsel stipulated that if they did not get favorable findings from the jury on their affirmative defenses (fraud and lack of mental capacity) to the release, the release was valid. Inasmuch as we later in the opinion uphold the jury's negative findings on fraud and lack of mental capacity, the issue of whether trooper Wyatt's testimony should have been admitted (except as to point of error four) is moot as to appellant John Klekar. Klekar's right to maintain the action has been extinguished by the jury's validation of the release of claim. However, we discuss the appellants' claimed error without regard to how the signing of the release determines the rights of any of the parties.

In point of error one, the appellants assert the trial court erred by allowing a non-designated witness to testify at trial. It is not disputed that the appellees were asked by interrogatories to name and provide reports of any and all expert witnesses they may call at trial, and further, to identify witnesses with any knowledge of relevant facts. It is undisputed that the appellees did not name trooper Wyatt as an expert.

The appellants agree they did not object to officer Wyatt testifying as a fact witness. Therefore, we construe the point of error to complain of the trial court allowing Wyatt to testify as an expert even though he was not designated as such by the appellees.

Southern Pacific sought to put DPS trooper Wyatt on the stand. Before trooper Wyatt gave his testimony, the appellants moved to disqualify him from testifying on the grounds that:

(1) Wyatt was not qualified to give expert testimony;

(2) Wyatt's testimony would not aid or assist the trier of fact pursuant to Tex. R.Civ.Evid. 702;

(3) Any relevance to his testimony would be substantially outweighed by unfair prejudice, confusion of the issues, and because it would mislead the jury pursuant to Tex. R.Civ.Evid. 403;

(4) Wyatt was not timely designated.

Given the specific nature of the point of error, we consider only the failure to timely designate. The rule states:

A party who fails to respond to or supplement his response to a request for discovery shall not be entitled to present evidence which the party was under a duty to provide in a response or supplemental response or to offer the testimony of an expert witness or of any other person having knowledge of discoverable matters, unless the trial court finds that good cause sufficient to require admission exists. The burden of establishing good cause is upon the party offering the evidence and good cause must be shown in the record.

Tex.R.Civ.P. 215(5).

"The rule is mandatory, and its sole sanction-exclusion of evidence is automatic, unless there is good cause to excuse its imposition." *Alvarado v. Farah Mfg. Co.*, 830 S.W.2d 911, 914 (Tex.1992). The appellees did not desig-

nate Wyatt as an expert, sought and did use his testimony as an expert, and thereby assumed the burden of establishing good cause in the trial court record justifying its introduction.

The appellees state several reasons why Wyatt's testimony was properly allowed. They are:

(1) The appellants have waived the right to complain;

(2) The appellees can rely on the appellants' designation of Wyatt;

(3) Wyatt was a rebuttal witness;

(4) Wyatt's testimony was cumulative;

(5) The appellants were not surprised by Wyatt's testimony;

(6) Wyatt's testimony was made moot by the jury's findings on issues regarding the release; and

(7) Good cause is shown in the record for the admission of Wyatt's testimony.

Appellees' assertions can be considered in three basic groups: waiver, good cause, and harmless error.

## 1. WAIVER

■■■ Wyatt was called to the stand by Southern Pacific, out of the presence of the jury. On direct examination for the appellants' bill of exceptions, Wyatt testified that he investigated and filed the official public report of the accident. After he arrived at the scene, he observed the location of the vehicles, interviewed those involved in the accident and the known witnesses, and on the basis of the foregoing, reached the conclusions and opinions reflected in the report.

Wyatt stated he had been employed by the DPS for 22 years and was a high school graduate. He has been through three-months training at the Fort Worth Police Academy, four-months training with the DPS, and seminars and continuing education throughout his years as a DPS officer. During his career as a DPS officer he had been required on many occasions to investigate and determine the cause of accidents.

On cross-examination, he testified that in 1986 he had a three-week advanced course in reconstructing accidents that involved car-train collisions. In other cases he has called on reconstruction engineers to assist him. He could not add anything to the eye witness accounts. He did not take the statements of Schwenke and Sternadel. He would not render an expert opinion without the statements of witnesses to the accident.

Following the completion of the "bill," the appellants' counsel again asserted Wyatt was not qualified as an expert, and objected that he was not timely named as an expert. The appellees' counsel did not dispute the appellants' assertion Wyatt was not named as an expert. Rather, the appellees stated Wyatt had testimony to give concerning the facts of the accident, that he had proved himself to be an expert, and, therefore, should be permitted to testify in both capacities. Appellants' counsel stated he had no objection to Wyatt testifying as a fact witness. The court ruled Wyatt could testify to the results of his investigation. The court stated that it would wait to see what evidence was put on before ruling on whether Wyatt's report would be admitted into evidence.

Then, before the jury, Wyatt testified to his qualifications, the investigation of the accident, and the conclusions he drew therefrom, essentially the same as he had testified in the hearing before the judge outside the presence of the jury. Appellant's counsel did not restate his objection to the admission of Wyatt's testimony as an expert before it was offered to the jury. At the conclusion of the bill, however, appellants inquired of the court whether he (Wyatt) would be allowed to answer questions as an expert. The court replied, "If he has laid the proper foundation to it, I think it's in his field. I see no reason why he wouldn't answer." Later the court stated, "It is my position that the man could testify to anything he found as a result of his investigation."

We interpret the court's language in the context of the conclusion of the hearing as overruling the appellants' objection to per-

mitting Wyatt to testify as an expert. It was unnecessary to repeat the objection before the evidence was offered to the jury. Tex. R.App.P. 52(b). Therefore, the appellants did not waive their objection to the admission of Wyatt's expert testimony.

## 2. GOOD CAUSE

■ The trial court has the discretion to determine whether the offering party met its burden of showing good cause. *Aluminum Co. of Am. v. Bullock,* 870 S.W.2d 2, 3 (Tex. 1994) (citing *Alvarado v. Farah Mfg. Co.,* 830 S.W.2d 911, 914 (Tex.1992); *Morrow v. H.E.B., Inc.,* 714 S.W.2d 297, 298 (Tex.1986)). The question before us is whether the trial court's implied finding of good cause was made without reference to any guiding rules or principles, and was therefore, an abuse of discretion. *See id.* "To establish a clear abuse of discretion, the complaining party must show that the trial court's action was arbitrary or unreasonable in light of all the circumstances of the particular case." *Smithson v. Cessna Aircraft Co.,* 665 S.W.2d 439, 443 (Tex.1984).

■ The salutary purpose of Tex.R.Civ.P. 215(5) is to require complete responses to discovery thus promoting responsible assessment of settlement and to prevent trial by ambush. *Alvarado,* 830 S.W.2d at 914.

Courts have identified several factors for a trial court's consideration in determining whether good cause exists.[2]

1) "Although lack of surprise is not the standard, it may be a factor for the trial court to consider when weighing whether good cause exists for allowing the testimony of an undisclosed witness." *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 395 n. 2 (Tex.1989).

2) The designation of the witness in question by other parties to the lawsuit is a factor to consider. *Aluminum Company of America,* 870 S.W.2d at 3.

3) The use of the witness in rebuttal in some circumstances may be considered. *Alvarado,* 830 S.W.2d at 916 n. 6.

4) "The lack of ... unfairness, or ambush does not alone satisfy the good cause exception to the sanction of automatic exclusion." *Sharp v. Broadway Nat'l Bank,* 784 S.W.2d 669, 671 (Tex.1990) (citing *Morrow,* 714 S.W.2d at 298).

"Counsel should not be excused from the requirement of the rule without a strict showing of good cause." *Alvarado,* 830 S.W.2d at 915. Therefore, we cannot permit the severity and potential unfairness of the application of the rule to color our consideration of what is, and what is not, good cause.

The supreme court has stated that surprise, standing alone, is in itself not enough for a finding of good cause under the rule.

A party is entitled to prepare for trial assured that a witness will not be called because opposing counsel has not identified him or her in response, to a proper interrogatory. Thus, even the fact that a witness has been fully deposed, and only his or her deposition testimony will be offered at trial, is not enough to show good cause for admitting the evidence when the witness was not identified in response to discovery. *Alvarado,* 830 S.W.2d at 915 (citing *Sharp,* 784 S.W.2d at 671).

In this case, trooper Wyatt was designated by the appellants as a fact witness, but not as an expert. Were the appellants surprised when the appellees sought to call Wyatt as both a factual and expert witness?

An aggrieved party may know of the existence of witnesses, and even of the testimony that they may give, and is therefore not surprised because of that knowledge when they are called to testify without warning. However, the failure to designate deprives the aggrieved party of knowing his adversary's intention to use that testimony in the trial, and he is surprised in that sense. Complex cases may require the taking of tens, sometimes hundreds of depositions. But even in the simplest cases, counsel can-

---

2. We isolate the factors in the list argued by the parties or those potentially relevant to the unique facts before us. It is not intended as an exhaus-

tive list of factors that might be considered by a trial judge under other factual circumstances.

not be expected to waste limited and expensive trial preparation time planning cross-examination of witnesses his adversary has manifested no intention to call. Counsel may not use his opposing counsel's knowledge of a witness against him, by using that knowledge to support a finding of good cause because of a lack of total surprise, and thereby gain tactical surprise and advantage in the use of the witness.

■ We understand *Sharp* to say that the absence of total surprise by the calling of a witness is not sufficient by itself to warrant a finding of good cause. Some knowledge of a witness will not prevent the harm sought to be avoided by the rule. One may argue that Custer was not totally surprised by the existence of Indians at the Little Big Horn, but whatever degree of surprise there was, it was fatal none the less.

■ However, the presence of other factors in the record may show a party has not been surprised in any sense by the calling of a undesignated witness. In this case, the appellants had named the witness and thereby warned the appellees that his testimony may be used by the appellants in the trial. The knowledge of the evidence of Wyatt and his use at trial is certainly more fairly chargeable against the appellants than a witness not designated by anyone. The supreme court in *Aluminum Company of America*, 870 S.W.2d at 3, has declined to decide whether sufficient good cause can exist based solely on an opposing party's designation. We also decline to do so, although such a designation is properly considered as a factor in the determination of good cause.

We hold that the trial judge's implied finding of good cause is not an abuse of discretion under the facts of this case. Allowing Wyatt to testify in a factual capacity, without objection, is further evidence the appellants were not ambushed or treated unfairly by allowing Wyatt to take the stand. The lack

of surprise manifested by the appellants' designation of Wyatt coupled with the appellants permitting Wyatt to testify as a fact witness without objection is a sufficient basis for the trial court's ruling.[3] If the rule's purpose is to promote responsible assessment of settlement and prevent trial by ambush, *Alvarado*, 830 S.W.2d at 914, those objectives have not been subverted by the factors underlying the finding of good cause in this case.

## HARMLESS ERROR

Given our finding of no error, it is unnecessary to address this aspect of the appellees' arguments. However, we note the appellants have not distinguished between how they were harmed by Wyatt's expert testimony as opposed to his testimony in general. Much of Wyatt's testimony the appellants claimed to be damaging was factual rather than expert. We are confident this commingling of factual evidence and the relative lack of expert testimony was another reason why the trial judge found good cause.

## STANDARD OF REVIEW: CHALLENGES TO EVIDENCE

In their fourth and fifth points of error, the appellants assert the jury's finding that John Klekar was not fraudulently induced to sign the release and that he had the mental capacity to enter into the release were against the great weight and preponderance of the evidence. In their second and third points of error, the appellants state the jury's findings that the whistle and bell were sounded as required by statute were against the great weight and preponderance of the evidence.

■ Only one standard of review is used in reviewing factual sufficiency of the evidence challenges, regardless of whether the court of appeals is reviewing a negative or affirmative jury finding or whether the complaining party had the burden of proof on the issue. *M.J. Sheridan & Son v. Seminole*

---

3. The appellees further argue that the status of trooper Wyatt as a rebuttal witness, even though called in their main case, can be weighed by the trial judge in determining good cause. We do not consider this contention as the other factors taken together are sufficient for a finding of good cause.

*Pipeline,* 731 S.W.2d 620, 623 (Tex.App.—Houston [1st Dist.] 1987, no writ). The court of appeals must first examine all of the evidence, *Lofton v. Texas Brine Corp.,* 720 S.W.2d 804, 805 (Tex.1986); and, having considered and weighed all of the evidence, it should set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965); *Otis Elevator Co. v. Joseph,* 749 S.W.2d 920, 923 (Tex.App.—Houston [1st Dist.] 1988, no writ). The reviewing court of appeals may not disregard a finding or make a contrary finding in entering judgment for one of the parties. *Garza,* 395 S.W.2d 821 at 823.

Because the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony, *Rego Co. v. Brannon,* 682 S.W.2d 677, 680 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.), the court of appeals may not substitute its opinion for that of the trier of fact merely because it might have reached a different fact conclusion. *Herbert v. Herbert,* 754 S.W.2d 141, 144 (Tex.1988); *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792, 896 (1951); *Clancy v. Zale Corp.,* 705 S.W.2d 820, 826 (Tex.App.—Dallas 1986, writ ref'd n.r.e.).

## MENTAL CAPACITY OF JOHN KLEKAR TO SIGN RELEASE

In their fifth point of error, appellants assert that the jury's finding that John Klekar had the mental capacity to enter into a release was against the great weight and preponderance of the evidence. We address this issue first because the release would not bind appellant Klekar, regardless of any fraud, if he did not have the requisite mental capacity to sign.

Dr. Fred L. Fason, a neuropsychiatrist, testified that he examined Klekar in December of 1989 and administered certain tests to him. Based on the testing and his examinations, he formed the opinion Klekar did not have the full capability to understand the release at the time he signed it as well as the significance of settling with the railroad. However, the jury could have chosen to discount or disbelieve the doctor's opinion because his first examination of Klekar occurred over two years after the signing of the release. In addition, Klekar refused any treatment or referral from the doctor.

Klekar testified that the release did not make much sense to him. However, the evidence showed Klekar read the release, corrected the spelling of his name on the document, signed it, and the next day negotiated the check without assistance, putting $8,000 into a CD. Further, there was evidence Klekar returned to his work two weeks after the tragedy and competently performed his job. The jury apparently weighed this evidence to conclude that Klekar did have the mental capacity to sign the release despite the obvious grief he was experiencing from such a tragic loss.

The appellants suggest Dr. Fason's testimony about John Klekar's mental capacity was uncontradicted and unimpeached leaving this court with no choice but to set aside the jury's answer to the special issue. But, "while the expert witness's testimony must be taken as true insofar as it establishes facts, the opinions of the expert as to deductions from those facts is never binding on the trier of facts, even though not contradicted by an opposing expert." *Gregory v. Texas Employers Ins. Ass'n,* 530 S.W.2d 105, 107 (Tex.1975). Regarding mental capacity, jurors may be aided by their own experience and knowledge. *Jensen v. Kisro,* 547 S.W.2d 65, 67 (Tex.Civ.App.—Houston [1st Dist.] 1977, no writ).

After reviewing the entire record, we are unable under the facts presented, to say that the jury was without discretion to find that Klekar had the requisite mental capacity to sign the release. We find the jury's answer to the special issue was not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. Accordingly, we overrule appellants fifth point of error.

## FRAUDULENT INDUCEMENT TO SIGNING OF RELEASE

The appellants assert in point of error four, that the jury's finding that John Klekar was not fraudulently induced to sign the release was against the great weight and preponderance of the evidence. Central to the jury's inquiry in answering the question was its necessary assessment of the credibility of Roy L. Henley, Jr., Southern Pacific's agent.[4]

The jury was asked in question 21 to answer yes or no to whether the release signed by John Klekar was induced by fraud. The jury was essentially instructed that fraud consists of the following elements:

(1) that a material representation was made; (2) that it (the material representation) was false; (3) that when the speaker made it, he knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) that it was made with the intention that it be acted on by the party; (5) that the party acted in reliance upon it; and (6) that the party suffered injury.

*Oilwell Div., United States Steel Corp. v. Fryer,* 493 S.W.2d 487, 491 (Tex.1973).

"Each of the elements must be established and the absence of any one of them will prevent recovery." *Id.* at 491. The contentious elements in this case are whether the material representation was false and that Henley knew it was false when he made it or made it recklessly without any knowledge of its truth. There is no conflict on the remaining elements.

Henley testified at trial he fabricated a story to John Klekar about the responsibility for the accident to induce him to sign the release of claim. Henley thus admitted before the jury his willingness to lie in service of a master. Other testimony indicated Henley's present employment was with a firm closely identified with the appellants' case. In addition, there was evidence suggesting

Henley had a personal motive to fabricate his trial testimony because of his alleged enmity for his former employer, Southern Pacific.

Further, Henley testified he made a specific representation to Klekar that the accident was the fault of his wife. There was ample evidence in the record from which the jury could have found that Henley's representation the accident was the fault of Tina was not false. There was the testimony from members of the train crew that they blew the whistle timely and Tina did not look at the train. Accident reconstruction expert Ruble, engineer O'Brien, and conductor Sutton gave testimony supporting the idea Tina did not stop before the collision. Several witnesses testified there was not a visibility problem at the crossing.

Sonia Elveston testified Henley had access to the claims file that contained all photographs, plus statements of the witnesses and the train crew. In addition the jury viewed photos of the scene taken two days after the accident. The jury could have concluded from the evidence any material representations made by Henley to Klekar were not false.

After reviewing the entire record, we are unable to say that the jury's finding that John Klekar was not fraudulently induced to sign the release is against the great weight and preponderance of the evidence. We overrule the appellants' fourth point of error.

## JURY'S FINDINGS RELATIVE TO ALLEGED NEGLIGENCE OF TRAIN CREW

The appellants assert the evidence of Sternadel, Pavlicek, and Schwenke on the failure to blow the whistle and ring the bell was unbiased, uncontradicted, and unimpeached, and therefore controlling on the jury. This overlooks the contradictory evidence offered by the three train crew members, albeit interested witnesses. There was evidence that both Pavlicek and Schwenke stated a certain time lapsed between when

---

4. The appellants complain the jury's finding on this special issue was also prejudiced by the testimony of trooper Wyatt. We discuss this contention under point of error one.

they heard a whistle and the sound of the collision.

We find no authority that suggests the jury is not entitled to resolve as they deem appropriate such contradictions in the evidence. The jury decided unanimously that the appellants had failed to establish by a preponderance of the evidence the negligence of the train crew. We hold the jury's finding was not so against the great weight and preponderance of the evidence as to be manifestly unjust or clearly wrong.

## IMPACT OF RELEASE ON ASPLUNDH RAILROAD, WILKINS AND RIX

The appellants claim in point of error six that Asplundh Railroad was not a party to the release. In point of error seven, the appellants assert the court erred in finding the actions of Wilkins and Rix were extinguished by the release signed by John Klekar. The resolution of these points of error is rendered moot by our holding that the trial court did not abuse his discretion in impliedly finding good cause to admit trooper Wyatt's testimony and that the jury's finding of no negligence on the part of the appellees was supported by the evidence. Accordingly, we overrule points of error six and seven.

We affirm the judgment of the trial court.

MIRABAL, Justice, concurring.

I concur.

I do not join in the majority's analysis under point of error one; rather, I would hold that appellants have not preserved for appellate review the issue raised under point of error one.

Appellants assert the trial court erred by allowing Officer M.D. Wyatt to testify at trial, because Wyatt was not designated as a witness by appellees before trial. Appellants, themselves, had listed Officer Wyatt as a potential fact witness during pretrial discovery. However, when appellees sought to call Wyatt as a witness, appellants moved to disqualify him from testifying, and the trial court conducted a hearing outside the pres-

ence of the jury. The transcript of that hearing covers 29 pages of the statement of facts. Appellants argued (1) that Wyatt was not qualified to give expert testimony because he lacked the necessary training and experience to qualify him to make an analysis of the evidence; (2) Wyatt did not do his own reconstruction of the accident, nor did he talk to all of the witnesses at the scene; and (3) allowing a police officer to give his opinion before the jury, when he was not qualified as an expert, would be highly prejudicial. Appellees responded that, in order to determine whether Wyatt was qualified as an expert, he needed to give testimony to the judge. Wyatt then testified, outside the presence of the jury, regarding his background, his experience, and his investigation and conclusions regarding the accident. Appellants' counsels then continued their objections as follows:

> (Plaintiffs' Counsel I): The officer should be disqualified as an expert in this. He admits he would need substantially more information before he could testify as an expert, which he didn't get.

> (Plaintiffs' Counsel II): 403, Texas Rules of Civil Procedure recognized *DeLeon* as being valid. The objection is that the value of any opinions he may give is substantially outweighed by the prejudicial effect, and therefore should be excluded. Cannot aid the jury in anything they haven't heard.

> (Plaintiffs' Counsel I): *Lastly, he was not timely named as an expert.*

> (Plaintiffs' Counsel II): That's right, Your Honor.

> (Defense Counsel I): If I can get a word in edgewise, whether we get into the expert issues or not, it's perfectly permissible for him to testify to the factual circumstances, as to what he observed. I think he should be permitted to testify to the factual issues.

> (Defense Counsel I): If the Court listened to some of his answers that he gave—counsel were both stepping on his answers—he started to say he had further to add to what was already presented in his

report. And he also testified I believe, he could have checked on the speed of the car if there were skidmarks, which is a fact issue that goes to the question of whether or not brakes were or were not applied.

I think for those purposes—I also think in fact that he has proven himself to be an expert. He should be permitted to testify before the jury, both on the factual basis and expert opinions with regard to the accident.

(Plaintiffs' Counsel I): *We have no objection to his testifying as a factual witness.* From the officer's own mouth, truthfully, he has said, before he could render an opinion as an expert, that there was essential data that he would need, hasn't been given, didn't know he was going to be an expert.

(Defense Counsel II): Mr. Sternadel and Mrs. Schwenke never identified themselves as witnesses, even though the investigating officer inquired.

The fact that they came up later and claimed they were witnesses has no bearing on what he decided. All of the objections go to the weight, not the admissibility.

The man who was at the scene of the accident ten minutes after the accident and had res gestae conversations with witnesses certainly should be able to give an opinion as well as a man sitting in New Mexico or Chicago as were the Plaintiffs' two witnesses.

(Plaintiffs' Counsel I): They were given the statements and the depositions of the other two eye-witnesses. This gentleman wasn't.

(Defense Counsel II): Which depositions.

(Plaintiffs' Counsel I): Both witnesses, plus statements taken by the railroad of Mr. Sternadel and Mrs. Schwenke and Mr. Pavelicek.

THE COURT: No reason this officer can't testify as to the result of his investigation.

(Plaintiffs' Counsel I): Does that mean he is going to be allowed to answer his expert opinion, is the question.

THE COURT: If he has laid the proper foundation to it, I think it's in his field. I see no reason why he wouldn't answer.

(Plaintiffs' Counsel I): How about the accident report? Is he going to be able to put that accident report with its hearsay conclusions in? We contend—

THE COURT: I think the usual procedure is to excise any statements he might make as to his conclusions, the way we normally do it. . . .

The parties and the Court then continued to discuss the admissibility of the accident report.

In my opinion, the disposition of appellants' point of error one hinges on whether the one sentence objection (*out of many pages of objections dealing with whether Wyatt was an expert*), was sufficient to enable the trial court to understand that appellants were raising the complaint they have raised on appeal—that appellees had not listed Wyatt as a potential expert witness. The one sentence objection was:

"Lastly, he was not timely named as an expert."

Appellants did not expound on this objection. There was no explanation about appellees' failure to list Wyatt as an expert witness in their answers to interrogatories. Even though appellees also failed to list Wyatt as "a person with knowledge of relevant facts" in their answers to interrogatories, appellants specifically waived any complaint about Wyatt testifying as a fact witness. Appellants did not, thereafter, reurge their objection that appellees had failed to designate Wyatt as an expert—rather, appellants continued to argue that Wyatt was *not qualified as an expert.*

To preserve error, an objection must state the specific grounds for the desired ruling if those grounds are not apparent from the context of the objection. Tex.R.App.P. 52(a).

A specific objection is one that enables the trial court to understand the precise grounds so as to make an informed ruling. *McKinney v. National Union Fire Ins. Co.*, 772 S.W.2d 72, 74 (Tex.1989). In my opinion, appellants' objection was not sufficient to direct the trial court's attention to the fact that Wyatt had not been designated as an expert witness in response to a discovery request. Accordingly, I would overrule appellants' point of error one.